COOLEY LLP
BENEDICT HUR (SBN: 224018)
(bhur@cooley.com)
JONATHAN PATCHEN (SBN: 237346)
(jpatchen@cooley.com)
MICHAEL ROME (SBN: 272345)
(mrome@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
Telephone:     +1 415 693 2000
Facsimile:     +1 415 693 2222

ELIZABETH B. PRELOGAR (SBN: 262026)
(eprelogar@cooley.com)
RAYMOND P. TOLENTINO (*Pro Hac Vice Pending*)
(rtolentino@cooley.com)
EPHRAIM MCDOWELL (*Pro Hac Vice Pending*)
(emcdowell@cooley.com)
1299 Pennsylvania Avenue NW, Suite 700
Washington, District of Columbia 20004-2400
Telephone:     +1 202 842 7800
Facsimile:     +1 202 842 7899

Attorneys for Plaintiffs
Google LLC and YouTube, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| GOOGLE LLC and YOUTUBE, LLC, | Case No. _____ |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| ROB BONTA, in his official capacity as Attorney General of California, | |
| Defendant. | |

**INTRODUCTION**

1.     Plaintiffs Google LLC ("Google") and YouTube, LLC (collectively, "YouTube"[1]) bring this action to enjoin Rob Bonta, in his capacity as the Attorney General of California ("Defendant" or the "State) from enforcing Sections 27001(a), 27002(b)(2), and 27002(b)(4) (collectively, the "Personalized-Feed Provisions") of California Senate Bill 976 ("the Act").[2] The Personalized-Feed Provisions unconstitutionally restrict YouTube's own protected right to curate, organize, and display the third-party speech of its users in violation of the First Amendment. *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024). They also unconstitutionally restrict millions of minor users' First Amendment right to access YouTube's curated feeds and compromise YouTube's current efforts to provide responsible, enriching, and age-appropriate content for minors through personalized recommendations. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3, 799–800 (2011). YouTube brings this suit on its own behalf—and in recognition of the interests of the millions of YouTube users who use the platform to discover relevant and valuable content every day—to enjoin these violations and ensure that access to the world's largest online video library, most-viewed television-distribution platform, and leading destination to listen to music and podcasts remains free and open in California.

2.     For people of all ages, YouTube serves as the preeminent online platform for viewing, sharing, and connecting with others through video content. With a collection of over 20 billion videos and hundreds of hours of new video content uploaded every minute, YouTube provides access to an endless array of videos on virtually every topic imaginable—from how-to videos to math lectures to network broadcasts. Millions of households now watch YouTube as they once watched television. Beginning in 2025, YouTube has accounted for a higher percentage of television use among U.S. viewers than any other media distributor in the United States. It is also the most frequently used service for listening to podcasts in the United States, and a leading music

---

[1] In this Complaint, the term "YouTube" refers to both entities collectively except where both entities are separately discussed or otherwise indicated. As explained below, Google owns YouTube, LLC, offers the YouTube service to the public, and is the service provider of YouTube under the YouTube Terms of Service. Where this Complaint refers to the YouTube, LLC entity specifically, it does so under the full name, YouTube, LLC.

[2] These sections are codified at Cal. Health & Safety Code §§ 27001(a), 27002(b)(2), and 27002(b)(4).

COMPLAINT

Cooley LLP
Attorneys at Law
San Francisco

streaming service. YouTube is a focal point of culture and content in the United States, and the scale and breadth of its offerings allows users of all ages to access a vast array of valuable video content about nearly any topic of interest to them—if they can find it.

3.      To help users navigate YouTube's vast library and create an experience that is right for them, YouTube offers carefully curated, personalized recommendations. Those recommendations make it easier for users to navigate the website—but the benefits of personalization extend far beyond easier navigation. The billions of users who visit YouTube come from all walks of life, ranging from students to grandparents to artists to scientists. Personalization allows those diverse users to find inspiration, relevant information, and enjoyment on YouTube despite their highly varied interests and preferences. Recommendations also allow the millions of content creators on YouTube to be discovered, share their ideas, and connect with large audiences.

4.      YouTube's recommendations reflect data about the user like watch history and expressed preferences through "likes" and "dislikes" and the "not interested" option, as well as YouTube's judgments about what kind of content may be appropriate and valuable for that user, consistent with YouTube's values as a company concerning the kind of content it wants to display and prioritize on its platform. For children and teens in particular, YouTube's personalized recommendations are imbued with YouTube's judgments developed in consultation with experts about the types of content appropriate for different age groups. So YouTube's recommendation system enables minors to access a diverse range of high-quality content while ensuring their experiences on the site are responsible, age-appropriate, and enriching.

5.      But if California Senate Bill 976 takes effect, minor users will lose access to the benefits of YouTube's recommendation system. The law's central provision prohibits platforms like YouTube from providing personalized recommendations to users under 18 without parental consent. The law also mandates settings that automatically strip minors' feeds of personalization, including age-appropriate recommendations, unless a "verified parent" says otherwise—and even then throttles access to personalized feeds to a highly restrictive one-hour daily limit by default.

6.      These restrictions on personalized feeds burden YouTube's protected right to express its view as to the content it believes will be relevant, valuable, and appropriate for each

particular user. They also burden the rights of minors to access speech and discover content without the permission of a parent. The Supreme Court has made clear that "minors are entitled to a significant measure of First Amendment protection" and "have the right to speak or be spoken to without their parents' consent." *Brown*, 564 U.S. at 794, 795 n.3. And that is for good reason. "Youth are people, not mere people-in-waiting or extensions of their parents. They have their own interests, ideas, and minds." *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007, at *16 (N.D. Fla. June 3, 2025). They have a constitutional right to explore their interests by accessing others' speech—a right that is infringed by restrictions in the Act that would render YouTube effectively unusable or turn it into a generic chronological feed that would bury older, high-quality content under an endless pile of irrelevant, more recent content.

7.  The Personalized-Feed Provisions openly violate the First Amendment by imposing government-mandated changes to YouTube's curation of content for minors. They constitute content-based restrictions on YouTube's expressive choices about how best to curate and compile third-party speech, as well as users' right to access that speech. And they do so in a heavy-handed manner that substitutes government control for parental supervision by default and undermines alternatives—including many already implemented by YouTube—that are more effective in protecting minors' wellbeing and less restrictive of speech. The default-setting provisions are also unconstitutionally vague because they depend on the undefined concept of a "verified parent."

8.  The Court should declare unconstitutional and enjoin the Personalized-Feed Provisions to stop the constitutional and practical harms that will otherwise be inflicted on YouTube and the millions of minor users who benefit from the platform.

**PARTIES & STANDING**

9.  Google[3] is a Delaware limited liability company and a wholly owned subsidiary of Alphabet, Inc., with its principal place of business located in the County of Santa Clara, California. Google owns and operates many products and services, including YouTube.

---

[3] This section of the Complaint refers to Google and YouTube, LLC separately as appropriate to describe their relationship and clarify that both entities have standing.

10.     YouTube, LLC is a Delaware limited liability company with its principal place of business located in California. YouTube, LLC is a subsidiary of Google, and Google is the sole member of YouTube, LLC.

11.     YouTube is one of many services Google makes available to the public for free when a user creates a Google Account. In order to sign into YouTube, a user must have a Google Account. When a user signs up for a Google Account, either on their own behalf or to create an account for an individual under the age of thirteen, they agree to both the Google Terms of Service and the Google Privacy Policy. The Google Privacy Policy identifies YouTube as an example of one of Google's apps and sites, and specifically discloses to users that Google "collect[s] information about your activity in our services, which we use to do things like recommend a YouTube video you might like."[4] The Google Terms of Service inform users that YouTube is governed by a separate, specific set of terms because of its unique features.[5] The YouTube Terms of Service expressly incorporate the Google Privacy Policy and indicate that Google is the entity providing the YouTube service.[6]

12.     Defendant Rob Bonta is the California Attorney General. Defendant is a California resident and is sued in his official capacity. The Act gives the California Attorney General enforcement authority. Cal. Health & Safety Code § 27006(a). Defendant has publicly pursued enforcement against some of Google and YouTube's fellow NetChoice members under other laws, advancing claims related to minors' online welfare. *See, e.g.*, Complaint, *California v. Meta Platforms, Inc.*, No. 4:23-cv-05448 (N.D. Cal. Oct. 24, 2023), Dkt. No. 1.

13.     Google and YouTube, LLC have standing to challenge the Personalized-Feed Provisions of the Act. In fact, the Court has previously observed that "[t]here is little question" that NetChoice's members, including Google and YouTube, LLC, "would otherwise have standing to sue in their own right" to challenge the Act's constitutionality. *NetChoice v. Bonta*, No. 5:24-cv-

---

[4] The current version of the Google Privacy Policy can be found at this URL:
https://perma.cc/UNW6-B4AD.
[5] The current version of the Google Terms of Service can be found at this URL:
https://perma.cc/SP9E-V9MM.
[6] The current version of the YouTube Terms of Service can be found at this URL:
https://perma.cc/T79F-SYPJ.

Cooley LLP
Attorneys at Law
San Francisco

**COMPLAINT**

07885-EJD (N.D. Cal. Dec. 31, 2024) ("NetChoice Action"), ECF. No. 39 at 32. Further, as explained herein, the Personalized-Feed Provisions interfere with YouTube's right to disseminate its speech in the form of curated compilations to its users, and "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes" injury-in-fact—indeed, "irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020). These injuries are "imminent," as California "has not suggested that the … law will not be enforced." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988).[7] And these injuries are directly traceable to the Personalized-Feed Provisions of SB 976. Further, an injunction prohibiting California from enforcing these provisions will address YouTube's injuries. Therefore, Google and YouTube, LLC have standing.

14.     Moreover, Google and YouTube, LLC independently have standing due to the chilling effect on their First Amendment rights created by the Personalized-Feed Provisions. "In the context of First Amendment speech, a threat of enforcement" can "chill[] the exercise of First Amendment rights." *Flaxman v. Ferguson*, 151 F.4th 1178, 1186 (9th Cir. 2025). This chilling effect is itself sufficient to create a "ripe First Amendment claim." *Id.* Likewise, the possibility of chilled speech (and corresponding injury to a plaintiff) is pronounced where the law at issue is a "vague statute" that "abut[s] upon sensitive areas of basic First Amendment freedoms," as is true of SB 976. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). Such uncertainty "operates to inhibit the exercise of [those] freedoms," thus creating injury to constitutional expression. *Id*.

15.     Google and YouTube, LLC also have standing to vindicate the First Amendment rights of YouTube's minor users to receive personalized content. As the Court explained in *Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383 (1988), "in the First Amendment context, litigants … are permitted to challenge a statute" not merely because "their own rights of free

---

[7] To the contrary, Defendant has asserted that enjoining enforcement of these provisions would "inflict irreparable harm on California by preventing enforcement of a statute enacted by the people's representatives." NetChoice Action, ECF. No. 18 at 31. And more recently, Defendant stressed his desire to enforce the law as soon as possible in the context of opposing NetChoice's motion for a stay pending appeal. Defendant argued that it was "*pressing* that the Court adjudicate those elements of SB 976 that were originally intended to go into effect on January 1, [2025,] *so that the State may proceed to enforce them*." NetChoice Action, ECF. No. 62 at 3–4 (emphasis added).

expression are violated," but also because "the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.* at 393 (citation omitted). Applying *American Booksellers* (which concluded that an association of booksellers had standing to assert the rights of book buyers), this Court and others have held that social-media companies and membership organizations have standing to vindicate the First Amendment rights of users. NetChoice Action, ECF. No. 39 at 22 ("NetChoice may raise the rights of its members' users."); *see also NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539, 551 (S.D. Ohio 2024) ("NetChoice has standing to bring both its claims on behalf of its member organizations and Ohioan minors."); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *12 (W.D. Ark. Aug. 31, 2023) ("NetChoice— like the booksellers' association in the Virginia case—is in a unique position to advocate for the rights of Arkansas users and may appropriately do so here."). Here, Google and YouTube, LLC are likewise "well positioned to raise the[] concerns" of their minor users as they "have a thorough understanding of the content hosted on [the YouTube] platform[] and the ways in which [their] customers exercise their First Amendment rights on [the] platform[]." *Id.*

## JURISDICTION & VENUE

16. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983, injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a).

17. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1) & (2) because Defendant performs his duties and thus resides in this District, and because the injuries giving rise to this action have been and will continue to be suffered by YouTube in Santa Clara County, California.

18. Assignment to the San Jose Division is proper under Local Civil Rule 3-2(c) & (e) because the injuries giving rise to this action have been and will continue to be suffered by YouTube in Santa Clara County, California.

# BACKGROUND

**A.    Google's YouTube Service**

19.    YouTube is an online platform that allows users to create, upload, and share videos with others around the world. It is the world's largest online video library, with a collection of over 20 billion videos. And more than 20 million videos are added to YouTube every day, with more than 500 hours of video uploaded every minute from a diverse community of creators, who span more than 100 countries and 80 languages.

20.    The videos on YouTube cover a wide range of subjects. Users can access videos explaining concepts as abstract as the building blocks of math and science, or as concrete as how to make home repairs. YouTube's videos can teach users how to throw a baseball, or show them historical World Series broadcasts; they can help users learn to play the guitar, or play a chart-topping music video. YouTube strives to be a community that fosters self-expression on an array of topics as diverse as its user base, and to nurture a thriving creative and informational ecosystem. YouTube benefits not only viewers but also millions of content creators who can reach a wide audience while earning revenue and even making a full-time living.

**B.    The YouTube Recommender System and Personalization on YouTube**

21.    YouTube does not just passively host videos uploaded by users but instead plays a role in selecting, arranging, and curating the videos presented to users. As explained above, YouTube hosts an enormous volume of content, encompassing billions of videos. Given this volume, YouTube does not present videos in reverse-chronological order. A great deal of high-quality content relevant to modern users has been on the platform for years, and such an approach would deprive users of the benefit of that content. In addition, chronological feeds allow spam and low-quality content to surface higher in results. And bad actors may be able to take advantage of chronological ordering to spread potentially harmful content to more users. Instead of chronological ordering, YouTube presents a customized and curated list of video recommendations to its users.

22.    These recommendations reflect YouTube's judgment as to how to arrange and prioritize videos to ensure that each user can find videos that are relevant, trustworthy, and valuable for that particular user. YouTube implements these editorials decisions primarily through its

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

"Recommender System," the system YouTube uses to make personalized content recommendations to its users.

23.    YouTube's Recommender System was created by YouTube engineers, who continue to refine it so that YouTube can deliver relevant, enjoyable, valuable, and high-quality content for a particular user at a particular moment. To accomplish that objective, the Recommender System uses a wide range of inputs—including data related to the user, other users on the platform, and the quality and popularity of videos on the platform—to make recommendations that are well-suited to each user. The Recommender System draws on numerous signals to create these tailored recommendations, ranging from the basic but fundamental (*e.g.*, what language the user speaks or what country she is located in) to the complex (*e.g.*, what new genre of video a user might enjoy based on the subject matter of the video or the preferences of other similar users). The Recommender System also gives users (and minors' parents) control over their personalized experience, allowing them to fine tune their recommendations by, for example, removing items from their search history; pausing their search history; and liking, disliking, or marking "not interested" in response to videos to express what they find valuable or off-putting.

24.    The Recommender System also incorporates YouTube's own standards about what type of content should be available to users, and whether that content should be prioritized or deprioritized. YouTube strives to prevent harmful content from spreading on its platform by taking steps to ensure that its Recommender System does not recommend content that violates YouTube's Community Guidelines. The Community Guidelines provide notice of what types of content are not permitted on YouTube and will be removed, including pornography, terrorist incitement, promotion of fraudulent schemes, violations of intellectual property rights, and bullying and harassment.

25.    For content that does not violate the Community Guidelines and therefore *can* be recommended, the Recommender System is imbued with YouTube's own expressive judgments about whether that content *should* be recommended. For example, YouTube deprioritizes "clickbait," which may generate high numbers of views but that YouTube regards as low-quality. In addition, YouTube's recommendations reflect judgment calls about how much novel, unfamiliar

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

content to show users—content which may be less valuable to them in the short term than familiar content akin to what they have viewed before but may be more valuable in the long term as it helps users discover more of what they might enjoy on the platform. Particularly relevant here, YouTube elevates certain content that it believes is likely to be enriching for children, such as content that promotes learning, curiosity, and looking after yourself and others. YouTube has also taken steps to ensure teen viewers are not exposed to repeated recommendations of certain content that could be problematic if viewed in high quantities, such as content that compares physical features and idealizes some body types over others, displays aggression, or encourages teens to ridicule others.

26.     YouTube provides personalized recommendations not only on a user's homepage but throughout the website. For example, YouTube designed its Search function so that a user who enters a search query receives results that, in addition to being generally high-quality, are personally relevant to that user.

27.     YouTube's Recommender System and its systems implementing YouTube's content-moderation policies work in tandem. They help YouTube prioritize and give greater prominence to videos that are relevant, trustworthy, and valuable to each user and less prominence to videos that are low-quality, less valuable, or are otherwise inconsistent with YouTube's values as a company.

## C.     YouTube's Parental Controls and Tools for Digital Wellbeing for Minors

28.     Recognizing that the privacy, physical safety, mental health, and wellbeing of children and teenagers are important when making online content available, YouTube has adopted policies and measures to help ensure that minors have age-appropriate and enriching experiences on the platform. YouTube also offers an assortment of technological tools and features that empower parents to tailor their children's and teenager's experiences on YouTube.

29.     For users under 13, YouTube has designed a standalone app called "YouTube Kids" that offers a separate experience geared toward younger users that is meant to be a safer and simpler experience for kids to explore. YouTube Kids curates age-appropriate content and provides additional tools—such as a built-in timer and the ability to block certain content or turn off the search function—that help parents supervise their children's experience. In addition, users known

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

to be under 13 cannot create an account on their own. Their parents must do so for them, which involves linking the parent's account to the child's so the parent can supervise and manage the child's activity on YouTube. Through these "Supervised Experiences," YouTube further enables parents to block specific channels; adjust their child's permissible content-level settings; and review, pause, or clear their child's watch history. YouTube also offers "Supervised Experiences for Teens," through which parents can view a teen user's number of uploads, subscriptions, and comments and receive notifications when their teen uploads a video or starts a livestream.

30. YouTube's Recommender System is central to maintaining a responsible and enriching platform for younger users. YouTube has determined that there are certain categories of content that do not violate its Community Guidelines but that may be inappropriate for minors, such as nudity and sexually suggestive content, violent or graphic content, and vulgar language. Videos falling within those categories are age-gated and not recommended to users under 18. In addition, YouTube has made the value judgment that certain content is "high quality" for minors (like videos demonstrating healthy habits or promoting critical thinking) and should be prioritized in recommendations for that group, while other content is "low quality" for minors (like videos that include heavily promotional content or encourage dangerous activities) and should be deprioritized. Similarly, the Recommender System ensures that teens are not overexposed to content that may be harmful if viewed repeatedly—for instance, content that displays social aggression or idealizes certain body types.

31. YouTube also offers digital wellbeing tools, which encourage minors to be mindful of their screentime. This includes default tools which turn off YouTube's autoplay feature, send "take a break" reminders, or remind the user to go to bed. And YouTube notifications are silent by default for all YouTube mobile app users on eligible devices between 10:00 p.m. to 8:00 a.m.

**D.     California Senate Bill 976 and its Provisions Governing Personalized Feeds**

32. In September 2024, California's Governor signed SB 976, also known as the Protecting Our Kids from Social Media Addiction Act. The Act regulates social-media platforms that offer users personalized feeds—described pejoratively and inaccurately throughout the Act as an "addictive feed." Under the Act, an "addictive feed" is defined as "an internet website … in

Cooley LLP
Attorneys at Law
San Francisco

which multiple pieces of media generated or shared by users are … recommended, selected, or prioritized for display to a user based … on information provided by the user, or otherwise associated with the user or the user's device," subject to only a limited set of exceptions. § 27000.5(a).[8] The Act imposes onerous restrictions on how (and when) covered websites may select, recommend, and display content for minors based on personalized recommendations.

33. *Parental Consent to View Personalized Feeds (§ 27001(a))*. The Act prohibits minors from accessing personalized feeds without parental consent. Specifically, under the Act, it is "unlawful for the operator of" a covered website "to provide an addictive feed to" a minor "user unless … [t]he operator has obtained verifiable parental consent." § 27001(a). Notably, even if parental consent is obtained, the Act forces covered websites to create default settings for minor users' accounts that continue to restrict access until "verified parents" (an undefined term) affirmatively change those settings. §§ 27002(b)(1)-(5); *see* NetChoice Action, ECF. No. 18 at 5 (filing by the State explaining that it understands the Act to require these settings to be on by default).

34. *Default Restrictions Limiting Access to Personalized Feeds Altogether (§ 27002(b)(4)) and for More than One Hour Per Day (§ 27002(b)(2)) (jointly, the "Default-Restriction Provisions")*. The Act mandates that personalized feeds be disabled by default unless and until the minor's "verified parent" alters that setting. § 27002(b)(4). The Act further mandates a default setting restricting minors' access to personalized feeds "to one hour per day unless modified by the verified parent." § 27002(b)(2).

35. *Other Provisions*. The Act also imposes a number of other requirements on covered websites. Covered websites must enable default settings that restrict notifications to minors during certain times of day, § 27002(b)(1); limit a minor's ability to review "likes or other forms of feedback," § 27002(b)(3); and set minors' accounts to "private" mode. § 27002(b)(5). In addition, the Act imposes "age assurance" requirements, §§ 27001(a), 27006(b)-(c), and annual disclosure obligations on covered websites, § 27005. As detailed below, these other provisions are being

---

[8] All references to legislative sections and provisions are to the Act unless otherwise indicated.

challenged by NetChoice on behalf of its members, including YouTube, and so are not at issue in this as-applied challenge focused on YouTube alone.

**E.     The NetChoice Litigation, This Court's Decision, and the Ninth Circuit's Order on Appeal**

36.     On November 12, 2024, NetChoice—an internet trade association with several social-media companies among its members, including Google and YouTube—filed this action seeking to enjoin enforcement of the Act. NetChoice argued that the Act violated the First Amendment on its face and as applied to NetChoice's members and was unconstitutionally vague.

37.     Before the Act's January 25, 2025 effective date, this Court granted a preliminary injunction in part but declined to enjoin most of SB 976's provisions. As relevant here, the Court rejected NetChoice's facial challenge to the central personalized-feed restriction because NetChoice had "not made a record … to show facial unconstitutionality." NetChoice Action, ECF. No. 39 at 22. And it concluded that NetChoice lacked associational standing to raise an as-applied challenge for its members, reasoning that "NetChoice's individual members" would need "to participate in this lawsuit" for the Court to decide the as-applied First Amendment claims. *Id.* at 32. The Court found the Default-Restriction Provisions (§§ 27002(b)(2) and (4)) subject to the same analysis and declined to enjoin them for the same reasons. *Id.* at 28.

38.     NetChoice appealed and sought an injunction pending appeal. This Court granted a 30-day injunction to enable appellate review, explaining that "the First Amendment issues raised by SB 976 are novel, difficult, and important, especially the law's personalized feed provisions." NetChoice Action, ECF. No. 47 at 4. The Court also recognized that if the Act violates the First Amendment, then NetChoice's members and the public "will suffer great harm from the law's restriction of speech." *Id.* And the Court found that, absent an injunction, companies like YouTube "may need to make significant changes to their feeds" and that SB 976 could "fundamentally reorient social media companies' relationship with their users." *Id.*

39.     The Ninth Circuit granted a further temporary injunction, barring the State from enforcing the Act during the appeal. *NetChoice v. Bonta* (9th Cir.), No. 25-146 (9th Cir. Dec. 31, 2024), Dkt. No. 11.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

40.     After expedited briefing and argument, the Ninth Circuit affirmed in relevant part. *See NetChoice, LLC v. Bonta*, 152 F.4th 1002 (2025). The Ninth Circuit held that NetChoice lacked associational standing to mount an as-applied challenge to the Personalized-Feed Provisions—namely, §§ 27001(a), 27002(b)(2), and 27002(b)(4)—and that NetChoice failed to show that those provisions were facially unconstitutional. 152 F.4th at 1025.

41.     The Ninth Circuit denied NetChoice's petition for rehearing and rehearing *en banc* on November 6, 2025. 9th Cir., Dkt. No. 75. The Ninth Circuit issued its mandate on November 13, 2025.

## CLAIMS

### Count I

### 42 U.S.C. § 1983

**Violation of the First Amendment, as Incorporated by the Fourteenth Amendment**

**(All Personalized-Feed Provisions - §§ 27001(a), 27002(b)(2), 27002(b)(4))**

42.     YouTube incorporates all prior paragraphs as though fully set forth herein.

43.     The Personalized-Feed Provisions—Sections 27001(a), 27002(b)(2), and 27002(b)(4)—violate the First Amendment because they are content-based restrictions on YouTube's expression and the speech rights of YouTube's users that fail heightened scrutiny.

44.     **The Personalized-Feed Provisions burden YouTube's and its users' speech rights.** The First Amendment protects the expressive choices inherent in curating "personalized" online feeds. *Moody*, 603 U.S. at 734, 740. "Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own." *Id.* at 731; *see Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 759 (9th Cir. 2024) (reaffirming, in the wake of *Moody*, that decisions about "which third-party content … [to] display, or how the display will be ordered and organized," are "expressive choices" (citation omitted)). Those curation decisions remain protected when implemented through algorithms that "simply act[] as a tool to implement a conscious human choice." NetChoice Action, ECF. No. 39 at 20 (citing *Moody*, 603 U.S. at 745-46 (Barrett, J., concurring)).

COMPLAINT

45.     Thus, as the Supreme Court correctly concluded in *Moody*, YouTube's personalized feeds constitute expression protected by the First Amendment. 603 U.S. at 734, 740. YouTube's recommendation system "embodie[s] human value judgments" about what kind of content is appropriate to recommend and which content to prioritize or deprioritize. NetChoice Action, ECF. No. 39 at 18. These judgments include which content is inappropriate to recommend at all under YouTube's Community Guidelines as well as for minor users in particular, and which content should be prioritized or deprioritized in recommendations for individual users. YouTube's recommendation system incorporates a variety of different inputs to make these editorial determinations—including not only data about users' online behavior but also YouTube's independent value judgments.

46.     YouTube further engages in protected expression by choosing to rely on personalized recommendations to curate content for users. Compiling a feed based on judgments about what individual users will find interesting is no less an exercise of editorial discretion in organizing or presenting third-party speech than any other expressive judgment. Thus, as this Court previously acknowledged, if "a human designs an algorithm for the purpose of recommending interesting posts on a personalized feed, the feed probably does reflect a message that users receiving recommended posts are likely to find those posts interesting." NetChoice Action, ECF. No. 39 at 20. And that is precisely how YouTube's recommendation system works: It is designed to display to each individual user the content that YouTube believes will be most relevant and valuable for that user, thereby communicating the message, "You are likely to find interesting the compilation of videos we have selected for you." By promoting or downgrading certain content in its recommendation system on an individualized basis, YouTube sends a message about speech it considers to be more valuable or less valuable for each particular user. Further, the message it conveys through recommendations is not limited to what a user will be interested in or find enjoyable or valuable. YouTube also communicates through its recommendations that, based on its independent judgment and values, it believes the content recommended is appropriate and beneficial for the user.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

47.     For example, specifically in connection with child-directed content, YouTube has developed, in consultation with experts, a set of quality principles, which set out certain factors to indicate what is considered low- or high-quality content in order to elevate high-quality, child-directed content within recommendations. YouTube has designed its Recommender System to implement these principles by leveraging technology to identify child-directed content that is high-quality (which should be promoted) as well as low-quality content (which should be minimized). Videos prioritized in recommendations as "high quality" under these principles include videos that demonstrate healthy habits, promote critical thinking, and include life lessons and strong, positive characters. By contrast, videos minimized in recommendations as "low quality" include heavily commercial or promotional content, content that encourages dangerous activities, and content that is sensational or misleading. As another example, YouTube has built its Recommender System to ensure that teens on YouTube are not overly exposed to content that, while not problematic as a single video, could be problematic for some teens if viewed in high quantities or on repeat, such as content that displays aggression, portrays delinquency or negative behaviors, depicts teens as cruel and malicious or encourages them to ridicule each other, or compares physical features or idealizes some body types, fitness levels, or weights over others. Thus, when minors receive recommendations from YouTube, those recommendations not only convey YouTube's belief about what will be interesting or valuable (though they certainly convey that); they also convey YouTube's judgment that content recommended to youth should be high-quality and beneficial and bolster learning, education, and good values.

48.     The Personalized-Feed Provisions burden YouTube's expression by (1) prohibiting YouTube from displaying personalized feeds to minors without parental consent, § 27001(a); and (2) requiring YouTube to implement default settings that prevent minors from viewing personalized feeds or limit the amount of time minors can view personalized feeds per day to a highly restrictive one-hour window, §§ 27002(b)(2), 27002(b)(4).

49.     In addition to restricting YouTube's expressive activity, the Act burdens minors' right to access a personalized compilation of speech on YouTube that is specifically designed to be relevant and valuable to them. The First Amendment protects not only the right to speak but also

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

"the right to *receive* information and ideas"—a right that is "fundamental to our free society." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (emphasis added). And "minors are entitled to a significant measure of First Amendment protection." *Brown*, 564 U.S. at 794 (citation omitted); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975) ("[T]he values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors.").

50.      Moreover, the Supreme Court made clear in *Brown* that minors specifically have a "constitutional right to speak or be spoken to *without their parents' consent.*" 564 U.S. at 795 n.3 (emphasis added). The *Brown* Court invalidated a California law prohibiting the sale or rental of violent video games to minors without parental consent, reasoning that a contrary rule would allow States to require parental consent before a minor could attend a political rally or religious service. *See id.* Such a result would be incongruous with minors' role as "citizens in training" who need robust First Amendment rights to be able to develop the "muscles" of citizenship. *Uthmeier*, 2025 WL 157007, at *16.

51.      The compilation of recommended content YouTube provides through personalized feeds is expressive speech that YouTube has a right to disseminate and that minors have a right to access without parental consent. Absent personalized feeds, minors would be deprived of a compilation of videos tailored to their interests and preferences—preventing them from effectively accessing the valuable content that YouTube provides. The State has proposed a reverse-chronological feed as an alternative. But given that more than 500 hours of content are uploaded to YouTube *every minute*, such a feed would bury content that is most interesting and valuable to individual minors under a pile of irrelevant, low-quality content. Another alternative that has been suggested is organizing content by popularity or its "trending" status. But such a system would promote content based solely on *other users'* preferences, thereby overriding any idiosyncratic preferences a particular minor has expressed. Moreover, content that is popular or "trending" across users of all ages may be less valuable, inappropriate, or potentially less safe for minors.

52.      The Personalized-Feed Provisions burden the First Amendment rights of YouTube's minor users by (1) preventing them from viewing personalized feeds without parental consent,

Cooley LLP
Attorneys at Law
San Francisco

§ 27001(a); and (2) imposing default settings that prevent them from viewing personalized feeds or limit the amount of time they can view personalized feeds per day to a highly restrictive one-hour window, §§ 27002(b)(2), 27002(b)(4). These provisions collectively mean that the State, not YouTube or its minor users, decides in the first instance (and prior to any parental involvement) the amount and type of content that YouTube can display and minor users can access.

53.     **The Personalized-Feed Provisions are content-based restrictions on speech subject to strict scrutiny.** Because YouTube has made "a colorable claim that its First Amendment rights … are threatened with infringement," the burden "shifts to the government to justify the restriction on speech." NetChoice Action, ECF. No. 39 at 5 (quoting *Smith v. Helzer*, 95 F. 4th 1207, 1214 (9th Cir. 2024)). The form of heightened scrutiny—intermediate or strict—depends on whether the law is content-neutral or content-based.

54.     "Laws that regulate speech based on its content are presumptively unconstitutional and subject to strict scrutiny." *Bonta*, 152 F.4th at 1015 (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). A law is content based if it "targets speech based on its communicative content." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022). Some content-based restrictions are "obvious, defining regulated speech by particular subject matter." *Reed*, 576 U.S. at 163. But other content-based laws "are more subtle, defining regulated speech by its function or purpose." *Id.* at 164. That is the case here, where the Act's restriction on personalized feeds targets speech with a particular quality to the exclusion of speech with other qualities and regulates speech based on its function or purpose.

55.     The Act specifically regulates speech with a particular quality: *personalized* content. That is just as content-based as a restriction on publishing "interesting" or "persuasive" content. And at the level of an individual user, a regulation on the personalized quality of speech is equivalent to a regulation on discrete topics like sports or music. In addition, the Personalized-Feed Provisions target speech based on its "function or purpose"—namely, the function of conveying personalized content to individual users. *Reed*, 576 U.S. at 164. And because YouTube's personalized recommendations communicate a message to users that YouTube thinks the content is suitable and worthwhile for the individual user, the Act also "targets speech based on its

communicative content," *Reagan Nat'l*, 596 U.S. at 76. For all of these reasons, the Personalized-Feed Provisions are content-based restrictions on protected expression.

56. **The Personalized-Feed Provisions fail any form of heightened scrutiny.** Because the Personalized-Feed Provisions are content-based and subject to strict scrutiny, the State must satisfy a "demanding standard"—showing that the requirements are "justified by a compelling state interest and [are] narrowly drawn to serve that interest." *Brown*, 564 U.S. at 799. And even if intermediate scrutiny applied, the State still must establish that the statute furthers an "important governmental interest[] unrelated to the suppression of free speech and does not burden substantially more speech than necessary." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997). Neither standard is satisfied.

57. As an initial matter, the State has failed to "show a direct causal link between" personalized feeds and "harm to minors." *Brown*, 564 U.S. at 799. The State's experts cite evidence suggesting that mechanisms *other than* personalization—such as infinite scroll, autoplay, and push notifications—may lead to such harm. NetChoice Action, ECF. No. 18-3 ¶ 54. With respect to personalization, the State's cited research is, at best, "based on correlation, not evidence of causation," which "will not suffice" under heightened scrutiny. *Brown*, 564 U.S. at 800 (citation omitted). And the State has offered no evidence supporting its choice of a seemingly arbitrary and highly restrictive one-hour window for the default setting required by Section 27002(b)(2).

58. Nor has the State established that the Act is "the least restrictive means among available, effective alternatives." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). Rather than restricting personalized feeds, the State could "incentiviz[e] companies to offer voluntary" controls or "educat[e] children and parents on the importance of using such tools"—which would serve the State's interest without direct governmental regulation of YouTube's expressive compilation. *Bonta*, 113 F.4th at 1121. YouTube already offers a wide range of such tools to help parents control their children's online activities, including bedtime reminders, take-a-break reminders, and disabled autoplay for minors. Moreover, the State fails to account for other tools, such as literacy programs promoting the wellbeing and mental health of minors, that do not broadly intrude on free expression. Nor does the State consider various widely available technologies that parents can

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

select to oversee their children's online activity without the need to restrict any particular platform: parents can of course decide not to allow their children to have an Internet-enabled device, and even if they do, parents can limit their children's use settings at the level of the device, wireless router, or web browser to monitor and enable notifications about their children's online activity and limit access to certain apps or websites.

59.    The Personalized-Feed Provisions are seriously underinclusive for multiple reasons. First, parental consent does not actually address the harm to minors that the State asserts. If a child or teen is suffering severe mental or physical harm from social media as the State claims (but does not prove), then one parent authorizing that activity to continue would not solve the issue. Thus, the legislative fix of parental consent does nothing to solve the purported problem. Second, the Personalized-Feed Provisions apply to websites like YouTube while exempting online streaming services like Netflix or Hulu that also rely on personalized recommendations and features like autoplay and therefore, under the State's theory, would seem to pose the same asserted dangers. Thus, the State "has singled out" certain websites "for disfavored treatment," while "giv[ing] no persuasive reason why." *Brown*, 564 U.S. at 802.

60.    In other respects, the Personalized-Feed Provisions are "vastly overinclusive." *Brown*, 564 U.S. at 804. They would restrict access to speech for *all* minors—even though even the State's experts admit that only a small number suffer from problematic Internet use. Section 27002(b)(4) is particularly overinclusive because it requires YouTube to establish a default setting that disables personalization of any kind for minors, and unlike the main provision, contains no exceptions for basic or technical information about the user such as language or country. That means minors restricted by that default setting would be left to wade through an avalanche of irrelevant content in different languages from unfamiliar creators discussing topics of no interest to them.

61.    Unless declared invalid and enjoined, the Personalized-Feed Provisions of the Act will irreparably harm YouTube and its users, depriving them of their fundamental First Amendment rights.

**Count II**

**42 U.S.C. § 1983**

**Void for Vagueness Under the Fourteenth Amendment**

**(Default-Restriction Provisions - §§ 27002(b)(2), 27002(b)(4))**

62.     YouTube incorporates all prior paragraphs as though fully set forth herein.

63.     Sections 27002(b)(2) and 27002(b)(4) of the Act are unlawful and unenforceable as applied to YouTube because they are unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment to the Constitution.

64.     A law is unconstitutionally vague and thus violates due process if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). A vague law implicating First Amendment freedoms is subject to "more stringent" scrutiny than in other circumstances—and is facially unconstitutional if it "reaches a substantial amount of constitutionally protected conduct." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494, 499 (1982).

65.     The Default-Restriction Provisions are unconstitutionally vague and violate the Due Process Clause of the Fourteenth Amendment. They do not define or provide guidance on what "verified parent" means or how a "parent" should be "verified." The term "verified parent" does not have a readily understood plain meaning. And verifying that an individual is the parent of a minor user encompasses a wide range of options that impose an equally wide range of burdens on YouTube, parents, and minor users. Further, the Act provides no guidance as to what it means to "verify" a parental relationship or how a company is supposed to do so. The State doesn't maintain a legal database of "verified parents," much less one that YouTube can access or align with its users' accounts.

66.     The Act obligates YouTube to restructure its site to implement default settings that bar personalized feeds for minors and alternatively restrict access to such feeds to daily limits, subject to override by "verified parents." The Act's immediate effect means that YouTube must

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

implement the Default-Restriction Provisions without appropriate guidance or standards from the State on the meaning of "verified parents."

67.     The Act's vagueness permits Defendant to engage in arbitrary enforcement against YouTube.

68.     Unless declared invalid and enjoined, the Default-Restriction Provisions of the Act will irreparably harm YouTube, depriving it of its right to due process under the Fourteenth Amendment.

## Count III

### Equitable Relief

### (All Personalized-Feed Provisions - §§ 27001(a), 27002(b)(2), 27002(b)(4))

69.     YouTube incorporates all prior paragraphs as though fully set forth herein.

70.     Sections 27001(a), 27002(b)(2), and 27002(b)(4) of the Act violate federal law and deprive YouTube and its users of enforceable federal rights. Federal courts have the power to enjoin unlawful actions by state officials. *Ex parte Young*, 209 U.S. 123, 155-56 (1908).

71.     This Court can and should exercise its equitable power to enter an injunction prohibiting Defendant from enforcing Sections 27001(a), 27002(b)(2), and 27002(b)(4) of the Act against YouTube.

## Count IV

### Declaratory Judgment

### (All Personalized-Feed Provisions - §§ 27001(a), 27002(b)(2), 27002(b)(4))

72.     YouTube incorporates all prior paragraphs as if fully set forth herein.

73.     Sections 27001(a), 27002(b)(2), and 27002(b)(4) of the Act are unlawful and unenforceable as applied to YouTube because they violate the First Amendment of the Constitution as applied to YouTube and thereby deprive YouTube, as well as its users, of enforceable rights.

74.     Sections 27002(b)(2) and 27002(b)(4) of the Act are also unlawful and unenforceable because they are unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment and thereby deprive YouTube, as well as its users, of enforceable rights.

75.     With exceptions not relevant here, in any "case of actual controversy within [their]

jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

76.     This Court can and should exercise its equitable power to enter a declaration that Sections 27001(a), 27002(b)(2), and 27002(b)(4) of the Act are unconstitutional and unlawful.

## PRAYER FOR RELIEF

YouTube requests an order and judgment:

A.     Declaring that Cal. Health & Safety Code §§ 27001(a), 27002(b)(2), and 27002(b)(4) of the Act are unlawful as applied to YouTube;

B.     Declaring that Cal. Health & Safety Code §§ 27001(a), 27002(b)(2), and 27002(b)(4) violate the First Amendment as applied to YouTube;

C.     Declaring that Cal. Health & Safety Code §§ 27002(b)(2) and 27002(b)(4) are void for vagueness under the Due Process Clause of the Fourteenth Amendment to the Constitution;

D.     Preliminarily and then permanently enjoining Defendant and his agents, employees, and all persons acting under their direction or control from taking any action to enforce Cal. Health & Safety Code §§ 27001(a), 27002(b)(2), and 27002(b)(4) against Google or YouTube, LLC;

E.     Entering judgment in favor of Google or YouTube, LLC;

F.     Awarding Google or YouTube, LLC its attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

G.     Awarding Google or YouTube, LLC all other such relief as the Court deems proper and just.

Dated: November 13, 2025                    COOLEY LLP


By: */s/ Elizabeth B. Prelogar*
Elizabeth B. Prelogar

Attorneys for Plaintiffs Google LLC and YouTube, LLC

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO