COOLEY LLP
BENEDICT HUR (SBN: 224018)
(bhur@cooley.com)
JONATHAN PATCHEN (SBN: 237346)
(jpatchen@cooley.com)
MICHAEL ROME (SBN: 272345)
(mrome@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
Telephone:    +1 415 693 2000
Facsimile:    +1 415 693 2222

ELIZABETH B. PRELOGAR (SBN: 262026)
(eprelogar@cooley.com)
RAYMOND P. TOLENTINO (*Admitted Pro Hac Vice*)
(rtolentino@cooley.com)
EPHRAIM A. MCDOWELL (*Admitted Pro Hac Vice*)
(emcdowell@cooley.com)
1299 Pennsylvania Avenue NW, Suite 700
Washington, District of Columbia 20004-2400
Telephone:    +1 202 842 7800
Facsimile:    +1 202 842 7899

Attorneys for Plaintiffs
Google LLC and YouTube, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

GOOGLE LLC and YOUTUBE, LLC,

            Plaintiffs,

      v.

ROB BONTA, in his official capacity as
Attorney General of California,

            Defendant.

Case No. 5:25-cv-09795-EJD

**GOOGLE LLC'S AND YOUTUBE, LLC'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

Hearing Date: February 5, 2026
Hearing Time: 9:00 a.m.
Judge: The Honorable Edward J. Davila

1

**TABLE OF CONTENTS**

2

NOTICE OF MOTION & RELIEF SOUGHT ........................................................................1

3

MEMORANDUM OF POINTS AND AUTHORITIES .........................................................1

4

INTRODUCTION ...................................................................................................................1

5

STATEMENT OF THE ISSUES.............................................................................................3

6

BACKGROUND .....................................................................................................................3

7

A.      Google's YouTube Service ..................................................................................3

8

B.      The YouTube Recommender System and Personalization on YouTube..............4

9

C.      YouTube's Parental Controls and Digital Wellbeing Tools for Minors.............6

10

D.      SB 976's Restrictions on YouTube's Expressive Speech....................................7

11

E.      Relevant Procedural History ................................................................................8

12

LEGAL STANDARD..............................................................................................................9

13

ARGUMENT ...........................................................................................................................9

14

I.      YOUTUBE IS LIKELY TO SUCCEED ON THE MERITS.........................................9

15

A.      The Act's Central Personalized-Feed Provision Violates the First Amendment.................9

16

       1.      The central personalized-feed provision burdens YouTube's own expressive speech, as well as its users' rights to access speech on the YouTube platform.........................9

17

18

       2.      The central personalized-feed provision is a content-based restriction on speech that must satisfy strict scrutiny .........................................................16

19

20

       3.      The central personalized-feed provision fails any form of heightened scrutiny........18

21

B.      The Act's Default Restrictions Unconstitutionally Burden YouTube's Speech and Are Void for Vagueness.........................................21

22

       1.      The default restrictions violate the First Amendment.................................22

23

       2.      The default restrictions are void for vagueness ..........................................23

24

25

II.      THE EQUITABLE FACTORS CUT DECISIVELY IN FAVOR OF A PI .................24

26

CONCLUSION.......................................................................................................................25

27

28

Cooley LLP
Attorneys at Law
San Francisco

i

**PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-cv-09795-EJD**

1

2

# TABLE OF AUTHORITIES

**Cases**

3

*44 Liquormart, Inc. v. Rhode Island,*
   517 U.S. 484 (1996)................................................................................19

4

5

*Am. Beverage Ass'n v. City & Cnty. of S.F.,*
   916 F.3d 749 (9th Cir. 2019) ................................................................24

6

7

*Ashcroft v. ACLU,*
   542 U.S. 656 (2004)..........................................................................19, 20

8

*Brown v. Ent. Merchs. Ass'n,*
   564 U.S. 786 (2011)................................................................... *passim*

9

10

*Children's Health Def. v. Meta Platforms, Inc.,*
   112 F.4th 742 (9th Cir. 2024) ...............................................................10

11

12

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
   596 U.S. 61 (2022)..........................................................................17, 18

13

*Cmty. House, Inc. v. City of Boise,*
   490 F.3d 1041 (9th Cir. 2007) ..............................................................25

14

15

*Computer & Commc'ns. Indus. Ass'n v. Uthmeier,*
   2025 WL 1570007 (N.D. Fla. June 3, 2025) .......................................15

16

17

*Erznoznik v. City of Jacksonville,*
   422 U.S. 205 (1975).............................................................................15

18

*FCC v. Fox Television Stations, Inc.,*
   567 U.S. 239 (2012).............................................................................23

19

20

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972).............................................................................24

21

22

*Harman v. City of Santa Cruz,*
   261 F. Supp. 3d 1031 (N.D. Cal. 2017) ..............................................24

23

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Group of Boston, Inc.,*
   515 U.S. 557 (1995).............................................................................10

24

25

*Miami Herald Publishing Co. v. Tornillo,*
   418 U.S. 241 (1974).............................................................................10

26

*Moody v. NetChoice, LLC,*
   603 U.S. 707 (2024)................................................................... *passim*

27

28

*National Urban League v. Ross,*
   484 F. Supp. 3d 802 (N.D. Cal. 2020) ................................................25

Cooley LLP
Attorneys at Law
San Francisco

ii

**PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-cv-09795-EJD**

*NetChoice v. Yost*,
    778 F. Supp. 3d 923 (S.D. Ohio 2025) ...................................................................20

*NetChoice, LLC v. Bonta*,
    113 F.4th 1101 (9th Cir. 2024) ....................................................................19, 20

*NetChoice, LLC v. Bonta*,
    152 F.4th 1002 (9th Cir. 2025) ...............................................................8, 12, 13

*NetChoice, LLC v. Griffin*,
    2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ........................................19, 20, 22

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)...................................................................................17

*Reuber v. Food Chem. News, Inc.*,
    925 F.2d 703 (4th Cir. 1991) (en banc) ...................................................14

*Sorrell v. IMS Health, Inc.*,
    564 U.S. 552 (2011)...................................................................14, 18, 19, 21

*Stanley v. Georgia*,
    394 U.S. 557 (1969) ..................................................................................14

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994)....................................................................................10

*Turner Broad. Sys., Inc. v. FCC*,
    520 U.S. 180 (1997)..............................................................................18, 19

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000)...............................................................................16, 20

*United States v. Williams*,
    553 U.S. 285 (2008).....................................................................................23

*Virginia v. Am. Booksellers Ass'n, Inc.*,
    484 U.S. 383 (1988)......................................................................................21

*Walker v. City of Birmingham*,
    388 U.S. 307 (1967)......................................................................................24

**U.S. Constitution**

U.S Const. amend. I ........................................................................................ *passim*

U.S. Const. amend. XIV ................................................................................. *passim*

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

**PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-09795-EJD**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Statutes**

Cal. Health & Safety Code § 27000.5 ...................................................................................7, 23

Cal. Health & Safety Code § 27001 ............................................................................. *passim*

Cal. Health & Safety Code § 27002 ............................................................................. *passim*

Cal. Senate Bill 976 (2024) ........................................................................................ *passim*

**Other Authorities**

N.D. Cal. Civ. L. R. 65-2 ..............................................................................................1

Fed. R. Civ. P. 65 .........................................................................................................1

Verification, Black's Law Dictionary (12th ed. 2024) ................................................23

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv

**PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-09795-EJD**

**NOTICE OF MOTION & RELIEF SOUGHT**

PLEASE TAKE NOTICE that on February 5, 2026 at 9:00 a.m. before Judge Edward J. Davila in Courtroom 5, 5th Floor of the above-entitled Court located at 280 S. First St., San Jose, CA, pursuant to Federal Rule of Civil Procedure 65 and Civil Local Rule 65-2, Plaintiffs Google LLC ("Google") and YouTube, LLC (collectively, "YouTube") will and hereby do move for a Preliminary Injunction ("PI") prohibiting Defendant Rob Bonta from enforcing Sections 27001(a), 27002(b)(2), and 27002(b)(4) (together the "personalized-feed provisions") of California Senate Bill 976 (2024) (the "Act" or "SB 976") against YouTube related to its provision of the YouTube service. YouTube and its users face immediate and irreparable harm without a PI. Absent such relief, the Act will unconstitutionally restrict YouTube's and its users' free speech rights under the First Amendment by forcing YouTube to comply with several provisions that impede minors' access to personalized feeds. The Act also violates the Fourteenth Amendment because it fails to define "verified parent" and is therefore unconstitutionally vague.

This motion is based upon the Complaint in this action, this Notice of Motion, the Memorandum of Points and Authorities, the Proposed Preliminary Injunction Order, the Declarations of Cristos Goodrow and Alexandra Veitch, all matters with respect to which this Court may take judicial notice, and such oral and documentary evidence as may be presented to the Court.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

For people of all ages, YouTube serves as the preeminent online platform for viewing, sharing, and connecting with others through video content. It has "let students find educational videos on subjects ranging from math, to science, to history," "allowed talented but unknown creators to share with global audiences," and "helped children learn their ABCs." Declaration of Alexandra Veitch (Veitch Decl.) ¶ 4. With over 20 billion videos and hundreds of hours of new video uploaded every minute, YouTube provides access to an endless array of videos on virtually every topic imaginable. To help users navigate that vast library and create an experience that is enriching and right for them, YouTube offers carefully curated, personalized recommendations. Those recommendations reflect data about the user, like watch history and preferences expressed through

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

**PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-09795-EJD**

1    "likes," "dislikes," and the "not interested" button, as well as YouTube's judgments about what kind

2    of content is appropriate and valuable for that user. For children and teens in particular, YouTube's

3    personalized recommendations enable access to a diverse range of high-quality content while

4    ensuring that minors' experiences on the site are responsible and age-appropriate.

5         But if California Senate Bill 976 is enforced against YouTube, minor users will lose access

6    to the benefits and protections of YouTube's system for providing personalized recommendations

7    (the "Recommender System"). The law's central provision prohibits platforms like YouTube from

8    providing personalized recommendations to users under 18 without parental consent. It also mandates

9    settings that automatically strip minors' feeds of personalization unless a "verified parent" says

10   otherwise—and even then throttles access to personalized feeds to a highly restrictive one-hour daily

11   limit by default.

12        By imposing government-mandated changes to YouTube's curation of content for minors,

13   these provisions not only prevent YouTube from providing safe, interesting recommendations to

14   minors, they also violate fundamental First Amendment principles. YouTube's personalized

15   recommendations reflect its own editorial judgments about the videos it believes will be relevant,

16   valuable, and enjoyable for each particular user at a particular moment. As the Supreme Court

17   recently recognized, such curated feeds are a "distinctive expressive product." *Moody v. NetChoice*,

18   *LLC*, 603 U.S. 707, 731 (2024). And minors have a corresponding First Amendment right to access

19   and receive YouTube's curated recommendations "without their parents' consent." *Brown v. Ent.*

20   *Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011). YouTube thus is likely to succeed on the merits: The

21   personalized-feed provisions impose content-based restrictions on YouTube's expressive choices

22   about how best to curate and compile third-party speech, as well as users' right to access that speech—

23   and they do so in a heavy-handed manner that substitutes government control for parental supervision

24   by default and ignores alternatives (including many already implemented by YouTube) that are more

25   effective in protecting minors' wellbeing and less restrictive of speech. These provisions fail any

26   level of heightened scrutiny. The default-setting provisions are also unconstitutionally vague because

27   they depend on the undefined concept of a "verified parent."

28        Last time this Court considered a challenge to SB 976's personalized-feed provisions in the

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-09795-EJD

action brought by NetChoice, it determined that it could not adjudicate an as-applied First Amendment claim without more information about how individual platforms operate. YouTube's suit solves that problem. And in the NetChoice litigation, both this Court and the Ninth Circuit recognized that the irreparable harm arising from First Amendment violations and the public interest in the free flow of speech favored putting SB 976 on pause while courts adjudicated the "novel" and "important" issues at stake—despite this Court's determination that NetChoice had failed to show that the law violates the First Amendment "on the current record." Dkt. No. 47 at 4.[1] Here, YouTube has set forth a detailed record demonstrating that the law's personalized-feed provisions violate the First and Fourteenth Amendments as applied to YouTube, so an injunction is all the more warranted.

## STATEMENT OF THE ISSUES

1. Is YouTube likely to succeed on the merits of its claim that Section 27001(a) infringes its and its users' First Amendment rights?

2. Is YouTube likely to succeed on the merits of its claim that Sections 27002(b)(2) and 27002(b)(4) infringe its and its users' First and Fourteenth Amendment rights?

3. Will YouTube and its users be irreparably harmed without an injunction, and do the balance of hardships and public interest favor enjoining Defendant's enforcement of the challenged provisions against YouTube?

## BACKGROUND

### A.    Google's YouTube Service

YouTube is an "online platform that allows users to view, create, upload, and share videos with others around the world." Declaration of Cristos Goodrow (Goodrow Decl.) ¶ 3. It is the world's largest online video library, with a collection of over 20 billion videos. *Id.* ¶¶ 3, 6. And more than 500 hours of video are uploaded to YouTube every minute from a diverse community of creators, who span more than 100 countries and 80 languages. *Id.* ¶ 6; Veitch Decl. ¶ 36. YouTube's users run the gamut in terms of age, ranging from children to teenagers to adults. Compl. ¶ 2.

The videos on YouTube cover a vast array of topics—from "educational videos, how-to videos, high-quality health information, [and] self-improvement videos" to "network broadcasts,

---

[1] References to "Dkt No." refer to entries on the *NetChoice v. Bonta* (No. 5:24-cv-07885) docket.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

**PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-09795-EJD**

science lectures, historical sporting events, and music videos," among countless other categories. Goodrow Decl. ¶ 3. YouTube "strives to be a community that fosters self-expression on an array of topics as diverse as its user base, and to nurture a thriving creative and informational ecosystem." Veitch Decl. ¶ 3. YouTube benefits not only viewers but also "provides a vibrant platform for millions of content creators to connect with audiences and share their unique expressive messages" while earning revenue and even making a full-time living. *Id.* ¶ 48.

Google makes YouTube available to the public as one of its products. Veitch Decl. ¶ 6. A user cannot sign into YouTube without a Google account; Google is the service provider of YouTube under the YouTube Terms of Service, which expressly incorporate the Google Privacy Policy; and YouTube uses information collected by Google in its recommendations. *Id.*

**B.    The YouTube Recommender System and Personalization on YouTube**

YouTube does not just host videos uploaded by users, but also plays a role "in selecting, arranging, and curating the videos presented to users." Goodrow Decl. ¶ 6. When a user opens YouTube, she "does not see" the videos posted "in reverse-chronological order." *Moody*, 603 U.S. at 719. Instead, YouTube uses its Recommender System to provide users with "an individualized list of video recommendations." *Id.* at 734. For example, a Golden State Warriors fan might see Steph Curry highlights on her homepage. Goodrow Decl. ¶ 14. A teen with a budding interest in robotics, meanwhile, might find videos about mechanical engineering. *Id.* In short, YouTube "arranges and prioritizes videos to ensure that each user can find videos that are relevant, trustworthy, and valuable to them." *Id.* ¶ 6. YouTube's Recommender System also benefits content creators, who rely on recommendations to connect with their target audience. Veitch Decl. ¶¶ 48-50.

YouTube engineers created, and continually refine, YouTube's Recommender System with the objective of delivering "relevant, enjoyable," "valuable," and "high-quality" content for "a particular user at a particular moment" and "optimiz[ing] for long-term user satisfaction." Goodrow Decl. ¶¶ 11, 13, 18. To accomplish that objective, the Recommender System uses a wide range of inputs—including data related to the user, other users on the platform, and the quality and popularity of videos on the platform—to make recommendations that are well-suited to each user. *Id.* ¶ 8. This system is akin to a librarian who "may recommend a book to a visitor based on the prior books that

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-09795-EJD

individual has read, books that are popular with similar readers, and the librarian's own views of the quality of the books." *Id.* But the Recommender System takes account of far more data than a librarian ever could, producing tailored recommendations based on a wide variety of signals. *Id.* ¶ 11. Those signals range from the basic but fundamental (*e.g.*, what language the user speaks or the country in which she is located) to the complex (*e.g.*, what new genre of video a user might enjoy based on her prior watch history and the preferences of similarly situated users). *Id.* ¶¶ 15, 19-20. The Recommender System also gives users (and minors' parents) control over their personalized experience, allowing them to fine tune their recommendations by, for example, removing items from their search history, pausing their search history, and liking or disliking videos to express what they find valuable or off-putting. *Id.* ¶ 38.

The Recommender System also incorporates YouTube's own standards about what type of content should be available to users and whether that content should be prioritized or deprioritized. *Id.* ¶¶ 24-31. YouTube strives to prevent harmful content from spreading on its platform by taking steps to ensure that it does not recommend content that violates YouTube's Community Guidelines. *Id.* ¶¶ 24-25. The Community Guidelines provide notice of what types of content are not permitted and will be removed, including pornography, terrorist incitement, promotion of fraudulent schemes, violations of intellectual property rights, bullying and harassment, and spam. *Id.* ¶ 24.

For content that does not violate the Community Guidelines and therefore *can* be recommended, the Recommender System is imbued with YouTube's judgments about whether that content *should* be recommended. For example, YouTube will not recommend "content indicating the Earth is flat simply because users have indicated they are satisfied with that content." *Id.* ¶ 16. Similarly, YouTube deprioritizes "clickbait" while raising the prominence of videos from certain sources "that are high-quality on important sensitive topics, including health, finance, and elections." *Id.* ¶¶ 28, 30. In addition, YouTube's recommendations are imbued with judgment calls about how much novel, unfamiliar content to show to users—such content may be less valuable to users in the short term compared to videos similar to what they have viewed in the past, but over the long term, it may prove more valuable as it helps users discover more of what they enjoy across YouTube's large library. *Id.* ¶ 15. YouTube has also made independent judgments about the kinds of content it

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-09795-EJD

does and does not want to recommend to children of different ages, and those judgments are built into its Recommender System. *Id.* ¶¶ 17, 31, 35

Thus, the ultimate recommendations YouTube makes reflect several editorial choices. YouTube decides not to recommend videos inconsistent with its values through enforcement of its Community Guidelines, and then makes judgment calls about how best to curate the content that remains so that it can recommend relevant, valuable, and enjoyable content for each particular user at a particular moment. *Id.* ¶¶ 15-18, 24-31.

### C.    YouTube's Parental Controls and Digital Wellbeing Tools for Minors

In recognition that the "privacy, physical safety, mental health, and wellbeing" of minors are important when making content available online, YouTube has adopted policies and a variety of measures to help ensure that minors have age-appropriate and enriching experiences on the platform. Veitch Decl. ¶ 9. YouTube also offers an assortment of technological tools and features that empower parents to tailor their children's and teenagers' experiences on YouTube.

For users under 13, YouTube has designed a special version of the platform called "YouTube Kids." *Id.* ¶ 19. YouTube Kids "features a carefully curated selection" of age-appropriate content and provides additional tools, such as a built-in timer, that help parents control their children's experience. *Id.* In addition, users known to be under 13 cannot create an account on their own. *Id.* ¶ 18. Their parents must do so for them, which involves linking the parent's account to the child's so the parent can manage the child's activity. *Id.* Through "Supervised Experiences," YouTube further enables parents to block specific channels, adjust permissible content-level settings, and review, pause, or clear their child's watch history. *Id.* ¶ 20. YouTube also offers "Supervised Experiences for Teens," through which parents can view their teen's number of uploads, subscriptions, and comments and receive notifications when their teen uploads a video or starts a livestream. *Id.* ¶¶ 16-17.

YouTube's Recommender System is central to "maintain[ing] a responsible and enriching platform for younger users." *Id.* ¶ 21. YouTube has determined that there are certain categories of content that do not violate its Community Guidelines but are inappropriate for minors, such as nudity and sexually suggestive content, violent or graphic content, and vulgar language. *Id.* ¶ 30. Videos falling within those categories are age-gated and not recommended to users under 18. *Id.* In addition,

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-09795-EJD

1   YouTube has made the value judgment that certain content is "high quality" for minors (like videos

2   demonstrating healthy habits or promoting critical thinking) and should be prioritized in

3   recommendations for that group, while other content is "low quality" for minors (like videos that

4   include heavily promotional content or encourage dangerous activities) and should be deprioritized.

5   Goodrow Decl. ¶ 35. Similarly, the Recommender System ensures that teens are not overexposed to

6   content that may be harmful if viewed repeatedly, such as "content that displays aggression" or

7   "idealizes some body types … over others." *Id.* ¶ 17; Veitch Decl. ¶ 21. YouTube is "constantly

8   updating these protections for teens"—just this year, it expanded the topics to deprioritize for teens

9   to include "unrealistic or bad financial advice that takes advantage of teens that may have low

10  financial literacy" and "content that portrays teens as cruel and malicious or encourages them to

11  ridicule others." Goodrow Decl. ¶ 17; Veitch Decl. ¶ 21.

12          YouTube also offers "digital wellbeing tools that encourage children and teens to be mindful

13  of their screentime." Veitch Decl. ¶ 22; ¶ 23 (turning off autoplay feature); ¶ 24 (turning on by default

14  "take a break" reminder); ¶ 25 (turning on by default go-to-bed reminders). Notifications are silent

15  by default for YouTube mobile app users from 10:00 p.m. to 8:00 a.m. *Id.* ¶ 52.

16          **D.      SB 976's Restrictions on YouTube's Expressive Speech**

17          In September 2024, California's Governor signed SB 976, also known as the Protecting Our

18  Kids from Social Media Addiction Act. The Act regulates social media platforms that offer users

19  "personalized feeds"—pejoratively (and unfairly) described throughout the Act as "addictive feeds."

20  The definition of "addictive feed" makes clear it is not tied to addiction but is instead about

21  personalization. Under the Act, an "addictive feed" is defined as "an internet website … in which

22  multiple pieces of media generated or shared by users are … recommended, selected, or prioritized

23  for display to a user based … on information provided by the user, or otherwise associated with the

24  user or the user's device"—unless a narrow exception applies. § 27000.5(a).[2] The Act imposes

25  onerous restrictions on how (and when) covered websites may select, recommend, and display

26  content for minors. YouTube challenges the following provisions on an as-applied basis:

27          *Parental Consent to View Personalized Feeds (§ 27001(a)).* The Act prohibits minors from

28

---

[2] All references to legislative sections and provisions are to the Act unless otherwise indicated.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

**PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-09795-EJD**

accessing personalized feeds without parental consent. Specifically, under the Act, it is "unlawful for the operator of" a covered website "to provide an addictive feed to" a minor "user unless … [t]he operator has obtained verifiable parental consent." § 27001(a). Even if parental consent is obtained, the Act forces websites to create default settings for minor users that continue to restrict access until a "verified parent" (an undefined term) affirmatively changes those settings. §§ 27002(b)(1)-(5).

*Default Restriction Limiting Access to Personalized Feeds Altogether (§ 27002(b)(4))*. The Act mandates that personalized feeds be disabled by default until the minor's "verified parent" alters that setting. § 27002(b)(4). *See* Veitch Decl. ¶ 44; Dkt. No. 18 at 11.

*Default Restriction Limiting Access to Personalized Feeds for More than One Hour Per Day (§ 27002(b)(2))*. The Act mandates a default setting restricting minors' access to personalized feeds "to one hour per day unless modified by the verified parent." § 27002(b)(2).

### E.    Relevant Procedural History

On November 12, 2024, NetChoice—an internet trade association with several social media companies among its members, including Google and YouTube—filed suit to challenge the Act and enjoin its enforcement. NetChoice argued that the Act violated the First Amendment on its face and as applied to NetChoice's members. Before the Act's January 25, 2025 effective date, this Court granted a preliminary injunction in part but declined to enjoin most of SB 976's provisions. Dkt No. 39. As relevant here, the Court concluded that NetChoice lacked associational standing to raise as-applied challenges to the personalized-feed provisions for its members, reasoning that "NetChoice's individual members" would need "to participate in this lawsuit" for the Court to decide the as-applied First Amendment claims. Dkt. No. 39 at 28, 32.

This Court then granted a 30-day injunction to enable appellate review, Dkt. No. 47 at 4, which the Ninth Circuit extended through the pendency of the appeal, 9th Cir., Dkt. No. 11.

The Ninth Circuit ultimately affirmed in relevant part, holding that NetChoice lacked associational standing to mount an as-applied challenge to the personalized-feed provisions—§§ 27001(a), 27002(b)(2), and 27002(b)(4)—and that it failed to show that those provisions were facially unconstitutional. *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1014, 1021-22 (9th Cir. 2025).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

**PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-09795-EJD**

1

**LEGAL STANDARD**

2       YouTube is entitled to a preliminary injunction if it shows that: (1) it "is likely to succeed on

3  the merits"; (2) it "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the

4  balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." Dkt. No. 39 at

5  5 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

6

**ARGUMENT**

7  **I.      YOUTUBE IS LIKELY TO SUCCEED ON THE MERITS**

8       **A.      The Act's Central Personalized-Feed Provision Violates the First Amendment.**

9       YouTube is likely to succeed in arguing that the Act's central restriction on personalized

10  feeds, § 27001(a), violates the First Amendment as applied to YouTube. This Court previously

11  explained that NetChoice members seeking as-applied relief needed to participate individually in

12  challenging SB 976 so that the Court could better understand "how each of those members' feeds

13  work." Dkt. No. 39 at 32. YouTube has heeded the Court's call, now participating individually and

14  providing detailed factual information on how its specific recommendation system and personalized

15  feeds work. *See generally* Goodrow Decl.; Veitch Decl. Those platform-specific facts demonstrate

16  that YouTube's personalized feeds consist of expressive speech protected by the First Amendment.

17  The Act burdens that speech based on its content and is therefore subject to strict scrutiny. And the

18  State cannot satisfy any level of heightened scrutiny because it has failed to demonstrate that the

19  central personalized-feed provision is narrowly tailored to its stated interest or why less restrictive

20  alternatives would not suffice.

21       *1.    The central personalized-feed provision burdens YouTube's own expressive
22       speech, as well as its users' rights to access speech on the YouTube platform.*

23       a. YouTube's personalized feeds constitute expression protected by the First Amendment.

24  Those feeds reflect YouTube's own judgments about what compilation of third-party content will be

25  appropriate and well-suited for an individual user, and they communicate YouTube's message that

26  the user will likely find the displayed content interesting and enriching.

27       The Supreme Court's decision in *Moody* compels the conclusion that YouTube's personalized

28  feeds are expressive. There, the Court held that the First Amendment protects "personalized" online

Cooley LLP
Attorneys at Law
San Francisco

9

**PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-cv-09795-EJD**

1  feeds just like YouTube's. 603 U.S. at 734, 740. It explained that "[d]eciding on the third-party speech

2  that will be included in or excluded from a compilation—and then organizing and presenting the

3  included items—is expressive activity of its own." *Id.* at 731. And the Court reasoned that "in making

4  millions of … decisions each day" about what to "include and exclude, organize and prioritize" in

5  users' feeds, online platforms "produce their own distinctive compilations of expression." *Id.* at 716.

6  That holds true, the Court concluded, even if the "selection and ranking" of content within those

7  compilations is achieved through an algorithm, and even if that algorithm "most often" relies on a

8  "user's expressed interests and past activities." *Id.* at 734-35; *see Children's Health Def. v. Meta*

9  *Platforms, Inc.*, 112 F.4th 742, 759 (9th Cir. 2024) (reaffirming, in the wake of *Moody*, that decisions

10  about "which third-party content … [to] display, or how the display will be ordered and organized,"

11  are "expressive choices" (citation omitted)).

12          The Supreme Court's conclusion that curated feeds are expressive followed directly from its

13  earlier precedents concerning traditional news media and other analog forms of content

14  dissemination. In *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), the Court held that

15  a state law requiring a newspaper to give a political candidate the right to respond to critical coverage

16  violated the First Amendment because it interfered with the newspaper's "exercise of editorial control

17  and judgment." *Id.* at 243, 258. In subsequent cases, the Court applied the same principle to cable

18  operators curating a selection of channels and a parade organizer deciding on the collection of

19  participating units. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 643-44 (1994); *Hurley v. Irish-*

20  *Am. Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 570, 572-73 (1995). *Moody*

21  likened virtual platforms that produce personalized feeds to those "[t]raditional publishers and

22  editors," whose "curated speech products" and "compilations" have long received First Amendment

23  protection. 603 U.S. at 717.

24          This Court need not start from scratch to determine whether, under *Moody*, YouTube's

25  recommendation system and the personalized feeds it produces are expressive speech. *Moody* applied

26  the First Amendment principles it articulated to paradigmatic examples—including YouTube itself.

27  603 U.S. at 734-35, 739-40. As this Court recognized before, the Supreme Court concluded that

28  YouTube's algorithm and resulting feeds—which produce "individualized list[s] of video

Cooley LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-09795-EJD

recommendations" for each user, *id.* at 735—"contain expressive elements" protected by the First Amendment, Dkt. No. 39 at 18 n.4, including "editorial judgments influencing the content" on YouTube's homepage, 603 U.S. at 744. This Court previously expressed some uncertainty as to whether it could adopt *Moody*'s findings with respect to YouTube. Dkt. No. 39 at 18 n.4. But the accompanying declarations confirm that the Supreme Court correctly understood how YouTube's recommendation system operates, so its conclusions as to YouTube apply with full force here.

Even if this Court were to begin the analysis anew based on the first principles articulated in *Moody*, it is clear that YouTube's personalized-recommendation system conveys YouTube's own expression in several ways. For starters, YouTube's system "embodie[s] human value judgments" about what kind of content is appropriate to recommend and how that content should be prioritized or deprioritized. Dkt. No. 39 at 18. In that way, YouTube's Recommender System is akin to the opinion page editor who "thinks some things off-limits" or "worth only a couple column inches." *Moody*, 603 U.S. at 738. The Recommender System will not suggest videos that violate YouTube's Community Guidelines, so the recommendations that users receive "necessarily reflect YouTube's judgments regarding which content to remove from its corpus." Goodrow Decl. ¶ 25. In addition, YouTube has imbued its Recommender System with value-laden judgments about which videos should or should not be elevated in a feed, including based on user characteristics like age. For example, for a minor user, YouTube's Recommender System will raise the profile of learning-related content and reduce the profile of sensational or misleading content. *Id.* ¶¶ 29-30. YouTube also makes judgments about how frequently to recommend novel, unfamiliar content to help a user discover new interests, as opposed to just showing her more of the same. *Id.* ¶ 15. By promoting or downgrading certain content in its recommendation system on an individualized basis, YouTube sends a message about speech it considers to be more or less valuable for each particular user.

YouTube further engages in protected expression by choosing to rely on personalized recommendations to curate content for users. Compiling a feed based on judgments about what individual users will find interesting and relevant is no less an exercise of editorial discretion in organizing or presenting third-party speech than any other expressive judgment. Thus, as this Court previously acknowledged, if "a human designs an algorithm for the purpose of recommending

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-cv-09795-EJD

interesting posts on a personalized feed, the feed probably does reflect a message that users receiving recommended posts are likely to find those posts interesting." Dkt. No. 39 at 20; *see also Bonta*, 152 F.4th at 1014 (explaining that algorithms that "express a platform's unique message to the world" are expressive). And that is precisely how YouTube's recommendation system works: It is designed to display to each individual user the content that YouTube believes will be most relevant, valuable, and enjoyable for that user, *see* Goodrow Decl. ¶¶ 6-7, 11, thereby communicating the message, "You are likely to find interesting the compilation of videos we have selected for you."

YouTube's users understand and rely on that message. When a user familiar with YouTube goes to the website, she expects that YouTube will have compiled a collection of videos for her that accounts for the interests and preferences she has expressed by, for example, repeatedly seeking out videos on certain topics in the past or indicating that she is "not interested" in other types of videos. Indeed, there is no reason for a user to indicate "not interested" *other than* to give YouTube that feedback to inform future tailored recommendations. If every time that user accessed YouTube, her homepage was full of videos she has already seen or on topics she has marked with "not interested," she would find YouTube's compilation to be less valuable or even affirmatively unhelpful. As a result, she would fault YouTube for communicating the message that she is likely to find the compilation interesting when that is untrue. *See Moody*, 603 U.S. at 739 (recognizing that "users may well attribute to the platforms the messages that the posts convey in *in toto*" and that "platforms may indeed 'own' the overall speech environment"). And over time she would likely understand YouTube to be communicating a different message like, "Here is a largely random assortment of videos that you may or may not enjoy or find relevant." The Act therefore requires YouTube to "alter its own message" to one that would make it a less valuable product for users. *Moody*, 603 U.S. at 729.

The analysis does not change just because YouTube exercises its "editorial discretion and human judgments about the value of speech" online. Dkt. No. 39 at 17. YouTube "re[lies] on algorithms" to translate its discretionary judgments into users' feeds, but that does not make those feeds any less expressive. *Id.* An "algorithm simply acts as a tool to implement a conscious human choice." *Id.* at 20 (citing *Moody*, 603 U.S. at 745-46 (Barrett, J., concurring)). And YouTube is continuously reviewing and refining its algorithm to reflect its judgments about what content is best-

suited for individual users and how that content should be organized. Goodrow Decl. ¶ 11. The Act's personalized-feed restriction burdens protected expression by "prevent[ing] [YouTube] from compiling the third-party speech it wants in the way it wants, and thus from offering the expressive product that most reflects its own views and priorities." *Moody*, 603 U.S. at 718.

To be sure, *Moody* reserved judgment on hypothetical algorithms that "respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards." 603 U.S. at 718 n.5. And this Court previously expressed some skepticism about whether, under *Moody*, "feeds responding solely to user actions" are expressive. Dkt. No. 39 at 19-20. The Ninth Circuit likewise suggested, without deciding, that an algorithm "probably is not expressive" if it merely "reflect[s] users' revealed preferences to them" rather than "express[ing] a platform's unique message to the world." *Bonta*, 152 F.4th at 1014 (citing *Moody*, 603 U.S. at 736 n.5); *see id.* at 1021 (declining to decide "novel question" given "thin record"). That tentative suggestion does not control here for two independent reasons.

*First*, as *Moody* recognized, YouTube's recommendation system *does not* "respond solely to how users act online." 603 U.S. at 736 n.5; *id.* at 744. YouTube's Recommender System incorporates a variety of different inputs, including but not limited to data about users' online activity. As noted, YouTube's Community Guidelines and its other content-based value judgments constitute a key component of its recommendations. Goodrow Decl. ¶¶ 18, 24-31; Veitch Decl. ¶¶ 29-30, 32. And the editorial decisions YouTube makes about how to balance its own standards and judgments with user-based information to create personalized recommendations is a form of protected expression. Earlier, this Court suggested that a "mixed" feed—one displaying posts based on "both content moderation policies *and* user activity" may not qualify as expressive. Dkt. No. 39 at 21. But *Moody* expressed no doubt that such feeds are expressive, even singling YouTube out as a prototypical example of a platform engaged in expressive curation when it offers users "an individualized list of video recommendations." 603 U.S. at 734.

*Second*, this Court has recognized that "the fact that *Moody* reserved judgment on feeds that 'respond solely to how users act online' does not mean that such feeds must be non-expressive and unprotected." Dkt. No. 39 at 18. As noted, the decision to curate content by tailoring the compilation

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-09795-EJD

1   to a particular user's interests itself reflects an editorial "choice[] about what third-party speech to

2   display and how to display it." *Moody*, 603 U.S. at 716. That choice—to show users what the editor

3   believes they will find interesting based on known information about them—is common in traditional

4   media. "[I]t is hardly unusual," after all, "for publications to print matter that will please their

5   subscribers" based on what has pleased them in the past. *Reuber v. Food Chem. News, Inc.*, 925 F.2d

6   703, 716 (4th Cir. 1991) (en banc). So YouTube's First Amendment rights would be implicated *even*

7   *if* its feeds responded solely to how its users acted online (which is not the case).

8        The Supreme Court's decision in *Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011), proves the

9   point. In *Sorrell*, the Supreme Court explained that "[a]n individual's right to speak is implicated

10  when information he or she possesses is subjected to 'restraints on the way in which the information

11  might be used' or disseminated." *Id.* at 568 (citation omitted). There, Vermont restricted the sale of

12  prescriber-identifying information from pharmacies to data mining firms, which used the data in

13  reports that helped pharmaceutical companies promote their prescription drugs to doctors. *Id.* at 558.

14  Vermont sought to restrict the sale of prescriber-identifying information because it made marketing

15  more effective: "Use of prescriber-identifying data helps [companies] shape their messages by

16  tailoring their presentations to individual prescriber styles, preferences, and attitudes." *Id.* at 561. The

17  Court held that because Vermont's law restricted the pharmacies' use of their lawfully possessed

18  information compiled and disseminated for marketing purposes, it implicated the First Amendment.

19  *Id.* at 568. *Sorrell* applies with full force here given that YouTube's recommendation system uses

20  information the platform lawfully possesses—about users' online behavior—to curate and display

21  content. Because the Act imposes "restraints on the way … [that] information might be used or

22  disseminated," it implicates YouTube's "right to speak." *Id.* Therefore, even if YouTube only

23  considered users' past preferences to predict what they would be interested in—*which, again, is not*

24  *the case*—the decision to curate feeds on that basis would be protected under *Sorrell.*

25       b. In addition to restricting YouTube's expressive activity, the Act burdens minors' right to

26  access a personalized compilation of speech on YouTube that is specifically designed to be relevant

27  and enriching for them. The First Amendment protects "the right to *receive* information and ideas"—

28  a right that is "fundamental to our free society." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969)

Cooley LLP
Attorneys at Law
San Francisco

14

PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-cv-09795-EJD

(emphasis added). And "minors are entitled to a significant measure of First Amendment protection." *Brown*, 564 U.S. at 794 (citation omitted); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975) ("[T]he values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors."). After all, "[y]outh are people" with "their own interests, ideas, and minds"—"not mere people-in waiting or extensions of their parents." *Computer & Commc'ns. Indus. Ass'n v. Uthmeier*, 2025 WL 1570007, at *16 (N.D. Fla. June 3, 2025).

Moreover, the Supreme Court made clear in *Brown* that minors have a "constitutional right to speak or be spoken to *without their parents' consent*." 564 U.S. at 795 n.3 (emphasis added). The *Brown* Court invalidated a California law prohibiting the sale or rental of violent video games to minors without parental consent, reasoning that a contrary rule would allow States to require parental consent before a minor could attend a political rally or religious service. *Id.* Such a result would be incongruous with minors' role as "citizens in training" who need robust First Amendment rights to develop the "muscles" of citizenship. *Uthmeier*, 2025 WL 1570007, at *16.

The compilation of recommended content YouTube provides through personalized feeds is expressive speech that YouTube has a right to disseminate and that minors have a right to access without parental consent. Absent personalized feeds, minors would be deprived of a compilation of videos tailored to their interests and preferences and most suitable to their educational needs. That dramatic change would impose a substantial First Amendment harm. YouTube's personalized recommendations have opened up a world of possibilities for minors. YouTube is "full of valuable and enriching content for minors," from "educational content" like "lectures on history from leading universities" and "step-by-step instructions on how to solve calculus problems," to enriching entertainment like "clips of the latest Broadway plays." Veitch Decl. ¶ 11. And personalized feeds enable minors to access the content most relevant and valuable for them from among the billions of videos on the platform. "[L]egislatively mandating parental consent 'could unnecessarily preclude some teens from accessing the basic benefits of the online world and have unintended effects on vulnerable youth,'" including minors whose parents are "incapacitated, abusive, not proficient in English, not technologically savvy, or otherwise not available." *Id.* ¶ 46 (citation omitted).

The State has proposed a reverse-chronological feed as an alternative. But given that more

**PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-cv-09795-EJD**

than 500 hours of content are uploaded to YouTube every minute, such a feed would bury content that is most interesting and appropriate for individual minors under a pile of irrelevant, low-quality content with a built-in recency bias. Goodrow Decl. ¶ 36. Other potential alternatives such as a feed organized by generic popularity or "trending" status would promote content based solely on *other users*' preferences, thereby overriding any idiosyncratic preferences a particular minor has expressed. "[A] teenager with a contrarian streak" who has selected "not interested" on a series of Taylor Swift songs, for example, may nevertheless repeatedly find Swift-related content in her feed because that content is popular with the average teen—fundamentally degrading her experience on the platform. *Id.* In any event, all of these proposed alternatives amount to the government "alter[ing] the content of [YouTube]'s compilation," which is a "distinctive expressive product" that minors have a right to access. *Moody,* 603 U.S. at 731-32.

This Court previously suggested that the Act does not restrict minor users' access to speech because it does not require removal of content and minors "may still access all posts by searching through the social media platforms." Dkt. No. 39 at 22. But minor users would lack access to the expressive *compilation* of speech that YouTube has determined they would find enriching and curated into a personalized feed. And even YouTube Search relies on personalization to work effectively. Goodrow Decl. ¶¶ 10, 36. Consider an elementary-school age user who is interested in art and would like to see videos about painting. "Without personalized recommendations, a search for 'painting tips' might" instead return results about "interior design or house painting." *Id.* ¶ 36. Even if particular videos on YouTube will not be rendered completely inaccessible to minors, the Act plainly burdens their right to access that speech. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000) ("It is of no moment that the statute does not impose a complete prohibition [on speech]. The distinction between laws burdening and laws banning speech is but a matter of degree.").

> 2.  *The central personalized-feed provision is a content-based restriction on speech that must satisfy strict scrutiny.*

Because YouTube has made "a colorable claim that its First Amendment rights … are threatened with infringement," the burden "shifts to the government to justify the restriction on speech." Dkt. No. 39 at 5 (quoting *Smith v. Helzer*, 95 F.4th 1207, 1214 (9th Cir. 2024)). Here,

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-09795-EJD

1    because the Act's central restriction on personalized feeds singles out a particular type of content—

2    personalized recommendations—that restriction is content-based and subject to strict scrutiny.

3        A law is content-based if it "targets speech based on its communicative content." *City of*

4    *Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022). Some content-based

5    restrictions are "obvious, defining regulated speech by particular subject matter." *Reed v. Town of*

6    *Gilbert*, 576 U.S. 155, 163 (2015). But other content-based laws "are more subtle, defining regulated

7    speech by its function or purpose." *Id.* at 163-64. That is the case here, where the Act's personalized-

8    feed restriction targets speech characterized by a certain quality to the exclusion of speech with other

9    qualities and regulates speech based on its function or purpose and communicative content.

10       *First*, the Act targets speech with a particular quality: *personalized* content. The specific

11   subject matter that qualifies as personalized content varies by user, but a law aimed at a quality of

12   speech does not escape content-based status simply because that quality encompasses multiple

13   discrete topics. For example, if a law prohibited newspapers from publishing "interesting" or

14   "persuasive" articles, it would plainly be content-based even though the articles that qualify as

15   "interesting" or "persuasive" may span a range of topics and vary depending on the newspaper's

16   readership. So too here, the restriction on personalized feeds is content-based even though the

17   category of personalized content encompasses many different topics. Indeed, as applied to YouTube's

18   interaction with individual users, the law does cover discrete topics—for example, barring YouTube

19   from using a minor's expressed interest in sports to show her clips on that subject.

20       *Second*, the Act's personalized-feed restriction targets speech with the "function or purpose"

21   of conveying personalized content to individual users. *Reed*, 576 U.S. at 163. The State admits as

22   much: it has said that, under the Act, YouTube can communicate with its users through feeds in any

23   way *other than* by personalizing content. 9th Cir., Dkt. No. 73.1 (asserting that the Act "does not

24   prevent platforms from showing non-addictive feeds (e.g., chronological-order feeds) or from

25   curating feeds, as long as they do not do so based on information persistently associated with a user").

26   So by its own admission, the State has singled out a specific form of communication and restricted it

27   based on its function and purpose. And because the function or purpose of YouTube's personalized

28   recommendations is to communicate a message to users—namely, that YouTube thinks the content

Cooley LLP
Attorneys at Law
San Francisco

17

PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-09795-EJD

1    is suitable and worthwhile for the individual user—the Act also "targets speech based on its

2    communicative content." *Reagan Nat'l*, 596 U.S. at 69.

3        If a law prohibited librarians from recommending new books to a patron based on that patron's

4    expressed interests and the librarian's views about the quality of the books and their fit for the patron,

5    it would plainly be content-based, even though that restriction would not single out books about a

6    particular topic. So too if a law required online newspapers to organize articles in chronological order

7    rather than in order of newsworthiness, that would easily qualify as content-based. Librarians make

8    personalized recommendations and newspaper editors organize articles with the goal of effectively

9    conveying content patrons will find interesting and relevant. Similarly, YouTube curates videos with

10   the goal of effectively conveying content users will find valuable. The Act's central personalized-

11   feed provision directly restricts that compilation of speech based on its function—with the goal of

12   making the compilation less compelling and interesting to minors. Because the Act's "purpose and

13   practical effect are to diminish the effectiveness" of a certain type of speech, the law "imposes

14   burdens that are based on the content of speech." *Sorrell*, 564 U.S. at 565.

15          *3.   The central personalized-feed provision fails any form of heightened scrutiny.*

16       Because the Act's central personalized-feed provision is content-based and subject to strict

17   scrutiny, the State must satisfy a "demanding standard"—showing that the restriction is "justified by

18   a compelling [state] interest and is narrowly drawn to serve that interest." *Brown*, 564 U.S. at 799.

19   And even if intermediate scrutiny applied, the State still would have to establish that the restriction

20   furthers an "important governmental interest[] unrelated to the suppression of free speech and does

21   not burden substantially more speech than necessary." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180,

22   189 (1997). Neither standard is satisfied.

23       As an initial matter, the State has failed to "show a direct causal link between" personalized

24   feeds and "harm to minors." *Brown*, 564 U.S. at 799. The State's experts cite evidence suggesting

25   that mechanisms *other than* personalization may lead to such harm. One report, for instance,

26   emphasizes that "design features like infinite scroll, autoplay, and push notifications" are

27   "mechanisms that extend [minors'] use." Dkt. No. 18-3 ¶ 54. But those separate features are distinct

28   from the personalization functions the State targets here. And the State's general claims about minors'

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-09795-EJD

time spent on social media say nothing about the effect of personalization. *See, e.g.*, Dkt. No. 18 at 9 (citing Dkt. No. 18-3 ¶ 55). At best, the State's cited research is "based on correlation, not evidence of causation," which "will not suffice." *Brown*, 564 U.S. at 800 (citation omitted).

Even if those evidentiary omissions could be overlooked, the State's theory seems to be that YouTube's personalized curation is too interesting and relevant for minors—and so YouTube's expression should be altered to make it less compelling. But that is not an interest "unrelated to the suppression of free speech." *Turner*, 520 U.S. at 189. As the Supreme Court has observed, "[t]hose who seek to … burden free expression often assert that disfavored speech has adverse effects," but seeking to suppress speech because it is effective "does not advance" policy goals "in a permissible way." *Sorrell*, 564 U.S. at 577; *see 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) (op. of Stevens, J.) ("The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good.").

Nor has the State established that barring all minors from viewing personalized feeds without parental consent is "the least restrictive means among available, effective alternatives." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). Rather than restricting personalized feeds, the State could "incentiviz[e] companies to offer voluntary" controls—which would serve the State's interest without direct governmental regulation of YouTube's expressive compilation. *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024); *see NetChoice, LLC v. Griffin*, 2025 WL 978607, at *14 (W.D. Ark. Mar. 31, 2025). As detailed above, *see supra* at pp. 6-7, YouTube already offers a wide range of tools to help parents control their children's online activities. Many of these tools directly address the issues raised by the State's experts. *Compare* Dkt. No. 18-3 ¶ 54 ("Youth point to design features like infinite scroll, autoplay, and push notifications as mechanisms that extend their use, make them feel compelled to return to media and displace other things they meant to do.") *with* Veitch Decl. ¶¶ 23-25 (describing YouTube's bedtime reminders, take-a-break reminders, and disabled autoplay for minors). The State has also failed to explain why widely available technologies that parents can use to oversee their children's online activity across multiple platforms—such as device-level options to disable Internet access or limit time on certain apps, wireless-router and web-browser settings that restrict access to certain sites, and third-party parental-control software—would be ineffective.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-09795-EJD

1  Legislation could even require platforms to make available voluntary tools that allow parents to turn

2  off features they view as harmful. This more calibrated approach—especially if combined with

3  existing tools that promote the wellbeing of minors—would effectively advance the State's interest

4  without broadly intruding on free expression and substituting the State's judgment for that of parents.

5       Further, if the State believes that these existing tools are ineffective, it can "provide parents

6  the information needed to engage in active supervision" over their children online, *Playboy*, 529 U.S.

7  at 826, and "educat[e] … parents on the importance of using such tools," *Bonta*, 113 F.4th at 1121.

8  The State "should not presume parents, given full information, will fail to act," *Playboy*, 529 U.S. at

9  824, or impose on parents what it thinks they "*ought* to want," *Brown*, 564 U.S. at 804; *see Ashcroft*,

10  542 U.S. at 669 (less restrictive alternatives included "promot[ing]" use of tools "by parents").

11       The main personalized-feed restriction is also "seriously underinclusive" because parental

12  consent does not actually address the State's alleged harms. *Brown*, 564 U.S. at 805. In *Brown*, the

13  Supreme Court held that a parental-consent law for violent video games was impermissibly

14  "underinclusive" because the State was "perfectly willing to leave" allegedly "dangerous, mind-

15  altering material in the hands of children so long as one parent … says it's OK." *Id.* at 802. So too

16  here. The State asserts that personalized feeds "pose a significant risk of harm to the mental health

17  and well-being" of minors, citing concerns over poor "sleep quality" and "anxiety and depression."

18  Dkt. No. 18 at 3, 9, 16; SB 976 § 1. But even assuming those harms exist, requiring parental consent

19  is "not how one addresses" such an allegedly "serious social problem." *Brown*, 564 U.S. at 802.

20       In accordance with *Brown*, courts have recently rejected similar state laws purporting to

21  protect minors from social media use through parental-consent requirements. In *Griffin*, the court

22  invalidated a law that did "nothing to protect" minors after they "receive[d] a parent's blanket

23  consent," even though the State claimed that "time spent on social media is highly correlated with the

24  risk of adverse mental health effects." 2025 WL 978607, at *12. And in *NetChoice v. Yost*, the court

25  invalidated a law that required certain online platforms to obtain "verifiable" parental consent before

26  minors could access content on those platforms because such consent was an "untargeted" way to

27  address the purported "dangers that social media might pose." 778 F. Supp. 3d 923, 931, 955-56 (S.D.

28  Ohio 2025). The same flaw exists here.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-09795-EJD

The main personalized-feed provision is underinclusive for an additional reason: It applies only to certain websites while exempting others that offer personalized recommendations. For instance, while YouTube must secure parental consent before showing minors personalized video recommendations, streaming services like Netflix and Hulu can freely provide those same minors with curated video feeds that rely on user activity and preferences. Given those arbitrary distinctions, minors can access the very types of personalized content the Act targets from some websites but not others. Thus, the State "has singled out" certain websites "for disfavored treatment," while "giv[ing] no persuasive reason why." *Brown*, 564 U.S. at 802.

In other respects, the Act is "vastly overinclusive." *Brown*, 564 U.S. at 804. It would restrict access to speech for *all* minors—even though the State's own experts admit that only a small number suffer from "problematic internet use" that interferes with their daily lives. Dkt. No. 18-3 ¶ 33. And it applies indiscriminately to minors of all ages, subjecting a 17-year-old to the same stringent restrictions as a 7-year-old, despite significant age-dependent differences in development, capability for self-regulation, and need for parental oversight. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 396, 398 (1988) (indicating that what is "harmful to juveniles" should account for "juveniles' differing ages and levels of maturity"). That is the antithesis of narrow tailoring.

In the end, while California "possesses legitimate power to protect children from harm," that "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794. Even a law with "proper policy goals" cannot survive heightened scrutiny unless it "advance[s] [those goals] in a permissible way." *Sorrell*, 564 U.S. at 577. In light of these principles, the Act cannot survive any level of heightened scrutiny.

**B.    The Act's Default Restrictions Unconstitutionally Burden YouTube's Speech and Are Void for Vagueness.**

The Act also requires YouTube to dramatically restructure its site by mandating default settings that (1) strip minors' feeds of personalization, § 27002(b)(4), and (2) set highly restrictive time limits on such feeds, § 27002(b)(2), unless a "verified parent" intervenes to change those settings. Dkt. No. 18 at 4-5 (filing by the State indicating the restrictions must be "enabled by default."). These default restrictions violate the First Amendment and are unconstitutionally vague.

Cooley LLP
Attorneys at Law
San Francisco

21

PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-cv-09795-EJD

*1. The default restrictions violate the First Amendment.*

The default restrictions—individually and taken together—violate the First Amendment: They impose serious burdens on YouTube's expressive activity and minor users' speech rights, discriminate based on content, and are not narrowly tailored to further the State's interest.

*First*, just as with the Act's central personalized-feeds restriction, the default restrictions squarely target expressive activity: They require YouTube to impose default settings that prevent minor users from receiving speech curated and recommended by YouTube, and then further require YouTube to throttle the amount of such speech minors can receive to a narrow one-hour window. Those restrictions therefore burden YouTube's expressive curation decisions and users' First Amendment right to receive that content. *See supra* Part I.A.1.

The default restrictions mean that the State, not YouTube or its minor users, decides in the first instance (and prior to any parental involvement) the amount and type of content that YouTube can display and minors can access. And by imposing a default one-hour time limit on a minor's ability to view personalized feeds, the Act impedes access to "vast quantities of constitutionally protected speech." *Griffin*, 2023 WL 5660155, at *17. This is a profound burden on speech. State-imposed rules about what minors can see or hear (and for how long) "without their parents' prior consent" do not respect "*parental* authority over children's speech," but rather "impose *governmental* authority, subject only to a parental veto." *Brown*, 564 U.S. at 795.

*Second*, the default restrictions are content-based. Like the main personalized-feed provision, they single out speech that YouTube has carefully curated and personalized for minor users while leaving other arrangements of speech free from regulation. *See supra* Part I.A.2.

*Third*, the default restrictions cannot satisfy any form of heightened First Amendment scrutiny. The default setting stripping minors' feeds of personalization is particularly poorly tailored because, unlike the main provision, it contains no exceptions to the prohibition against considering information about the user. That means YouTube would be barred from considering even the user's language or country, and minors would be left to wade through an avalanche of irrelevant content in different languages from unfamiliar creators. Goodrow Decl. ¶ 39. And that fundamental change to YouTube's expression is not necessary to achieve the State's asserted interest. YouTube already

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-09795-EJD

1    incorporates critical safeguards into its recommendations for minor users and offers parents tools to

2    supervise their children's experience on YouTube. *See supra* pp. 6-7. The only effect of these default

3    restrictions is to substitute the State for parents with government-mandated changes to YouTube's

4    expressive product—an interest that is not unrelated to the suppression of free speech or sufficiently

5    tailored given the ready availability of less restrictive alternatives. *See supra* Part I.A.3.

6                    *2.    The default restrictions are void for vagueness.*

7        The default restrictions are unconstitutionally vague because they do not provide "fair notice

8    of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253

9    (2012). Fair notice requires that laws not be "so standardless" that a person "of ordinary intelligence"

10   cannot ascertain how to comply. *United States v. Williams*, 553 U.S. 285, 304 (2008). The default

11   restrictions fail to provide the barest of standards for compliance because it is impossible to discern

12   what they mean by the key statutory term, "verified parent."

13       As explained above, the Act mandates that YouTube ensure that the default restrictions are

14   altered only by "the verified parent of a user." § 27002(b). But the Act does not define what it means

15   by "verified parent" or how a "parent" should be "verified." All the Act says is that "'[p]arent' means

16   a parent or guardian, including as defined in" forthcoming "regulations." § 27000.5(f). The word

17   "verified" does not even appear in the Act's definitions section.

18       The Act's failure to define the critical term "verified parent" is fatal where, as here,

19   verification eludes a readily understood plain meaning. Verification may encompass procedures as

20   strict as "a formal declaration made in the presence of an authorized officer" or as relaxed as simple

21   "acknowledgment." Verification, Black's Law Dictionary (12th ed. 2024). A parent-child

22   relationship can be "verified" by something as simple as a check-box, or as onerous as uploading a

23   birth certificate. So too with a guardian-child relationship: An attestation may be enough to constitute

24   verification, or a court order could be required. This lack of clarity may prove especially burdensome

25   for children who belong to non-traditional households.

26       It makes no difference that regulations might later clarify this issue. While the Act directs that

27   "regulations promulgated pursuant to this chapter" will further define "parent," it says nothing to

28   suggest that regulations will explain what the Act means by verification. § 27000.5(f). And

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23

PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-09795-EJD

1    regardless, the law will take effect *now* unless this Court grants immediate relief. Needless to say, as-

2    yet-promulgated regulations cannot solve a void-for-vagueness problem.

3         Because the Act leaves so much uncertain, the only resolution will come through future

4    rulemaking or the enforcement decisions of the California Attorney General. This type of back-end

5    resolution is intolerable—companies cannot make compliance decisions unless they can reliably

6    predict how a law will be enforced. This uncertainty in turn leads companies to consider erring on

7    the side of stringent verification procedures. That overcorrection comes at a cost, creating barriers for

8    users who may well give up, imposing a "chilling effect upon the exercise of First Amendment

9    freedoms." *Walker v. City of Birmingham*, 388 U.S. 307, 345, 348 (1967). Because the default

10   provisions force YouTube to "steer far wider of the unlawful zone … than if the boundaries of the

11   forbidden areas are clearly marked," they violate due process and trample free speech. *Grayned v.*

12   *City of Rockford*, 408 U.S. 104, 109 (1972) (citation omitted).

13   **II.    THE EQUITABLE FACTORS CUT DECISIVELY IN FAVOR OF A PI**

14        Given the "significant public interest in upholding First Amendment principles," YouTube's

15   showing of a "colorable First Amendment claim" alone entitles it to a preliminary injunction. *Am.*

16   *Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 758 (9th Cir. 2019). But even if YouTube has

17   raised only "serious questions going to the merits," a preliminary injunction is appropriate because

18   there is a "likelihood of irreparable injury," the "balance of hardships tips sharply toward the

19   plaintiff," and an "injunction is in the public interest." *Harman v. City of Santa Cruz*, 261 F. Supp.

20   3d 1031, 1040-41 (N.D. Cal. 2017) (Davila, J.).

21        This Court has already recognized that the equitable factors overwhelmingly favor keeping

22   the status quo in place while First Amendment challenges to the Act are resolved. Earlier, the Court

23   determined that NetChoice was unlikely to succeed on the merits of its challenge to the personalized-

24   feed provisions—in large part because the participation of individual members, and information about

25   how those members' feeds and recommendation systems work, was missing. Nevertheless, the Court

26   enjoined SB 976 pending appeal, reasoning that "the First Amendment issues raised by SB 976 are

27   novel, difficult, and important, especially the law's personalized feed provisions." Dkt. No. 47 at 4.

28   The Court explained that, if the Act's central provisions violate the First Amendment (which the

Cooley LLP
Attorneys at Law
San Francisco

24          PLAINTIFFS' NOTICE OF MOTION AND
            MOTION FOR PRELIMINARY INJUNCTION
            CASE NO. 5:25-cv-09795-EJD

1   Court did not believe NetChoice had shown "on the current record"), then "[NetChoice's] members

2   and the community will suffer great harm from the law's restriction of speech" and "the public interest

3   would tip sharply in its favor because there is a strong interest in maintaining a free flow of speech."

4   *Id.* The Court further found that irreparable harm was likely because "NetChoice's members … may

5   need to make significant changes to their feeds." *Id.*

6         Much of the same logic applies here. The First Amendment issues remain important. And

7   YouTube and its users will suffer significant, irreparable harm from the Act's novel and sweeping

8   restrictions on speech. That is both because YouTube's own speech will be restricted—affecting the

9   rights of millions of users to access speech on YouTube—and because YouTube will be forced to

10  "expend[] money or resources" that "cannot be recouped" to overhaul its operations to comply with

11  this unconstitutional law. *National Urban League v. Ross*, 484 F. Supp. 3d 802, 806 (N.D. Cal. 2020).

12  Because YouTube has "raised 'serious First Amendment questions,'" "the balance of hardships tips

13  sharply in … favor" of injunctive relief. *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th

14  Cir. 2007) (citation omitted). And the public's "strong interest in maintaining a free flow of

15  information" favors adjudicating the constitutionality of the personalized-feed provisions before they

16  "fundamentally reorient [YouTube's] relationship with [its] users." Dkt. No. 47 at 4.

17        The key difference from last time is that YouTube *has* shown that it is likely to succeed on

18  the merits of its as-applied First Amendment claims, by participating individually and providing the

19  Court with detailed information about how its feeds and recommendation system work. Previously,

20  as to the claims on which NetChoice had shown a likelihood of success, this Court did not hesitate to

21  enter a preliminary injunction, readily concluding that "NetChoice's members would suffer

22  irreparable harm …, and there is a strong public interest in protecting free speech." Dkt. No. 39 at 28,

23  31. Given YouTube's robust showing on the merits, the Court should do the same here—thereby

24  maintaining the status quo of the last 11 months as to three provisions of the Act as applied to

25  YouTube while the Court adjudicates the "novel" and "important" issues at stake on a new record.

26                                 **CONCLUSION**

27        The Court should grant YouTube's motion for a preliminary injunction.

28

Cooley LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25

PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-09795-EJD

1 | Dated: November 18, 2025

2

3

COOLEY LLP

By: */s/ Elizabeth B. Prelogar*
    Elizabeth B. Prelogar

Attorney for Plaintiffs Google LLC and
YouTube, LLC

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

26

PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 5:25-CV-09795-EJD